UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROSS CAMPBELL,

Petitioner,

- against -

MARK MILLER,

Respondent.

25-cv-6001 (JGK)

Order

John G. Koeltl, District Judge:

The Court received the attached letter and submission from the petitioner, which it now forwards to the respondent.

The Clerk of Court is respectfully requested to mail a copy of this Order to the petitioner, and to note mailing on the docket.

SO ORDERED.

Dated: New York, New York
October 8, 2026

John G. Koeltl
United States District Judge

ROSS CAMPBELL
Green Haven Correctional Facility
594 Route 216
Stormville, New York 12582

September 25, 2026

ATTN: Hon. John G. Koeltl, U.S.D.J.
c/o: CLERK OF COURT
United States District Court
Southern District of New York
U.S. Courthouse
500 Pearl Street
New York, NY 10007

Re: 25-cv-6001 (JGK)
CAMPBELL v. MILLER

Your Honor:

I hope that this letter finds you well. Enclosed is my Reply to the State's Answer and Memorandum of Law in Opposition to my Petition for writ of Habeas Corpus.

PLEASE BE ADVISED, I haven't received your Order granting or denying my request for permission to enlarge the time to file a corrected and amended reply. But, in good faith I submit the Reply. And, I have caused a copy to be sent to the Respondent.

Again, I thank you Your Honor for the extensions and understanding of my circumstances.

Thank you in advance for your time, energy, and consideration in regards to this matter. With all good wishes,

Gratefully yours,

ROSS CAMPBELL

United States District Court

Southern District of New York

**25-cv-6001 (JGK)**

**ROSS CAMPBELL,**

Petitioner,

-against-

MARK MILLER,

Respondent.

Petitioner's Reply

to the State's Answer and Memorandum of Law

Opposing Petitioner's Petition for Writ of Habeas Corpus

ROSS CAMPBELL,
Petitioner, pro se
594 Route 216
Stormville, NY 12582

September 25, 2026.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................... iii

QUESTIONS PRESENTED .................................................... vii

PRELIMINARY STATEMENT .................................................... 1

SUMMARY OF THE ARGUMENT .................................................... 5

GROUND ONE .................................................... 9

The State Court Unreasonably Applied Strickland v. Washington, 477 U.S. 668 (1984), Wiggins v. Smith, 539 U.S. 510 (2003), and Rompilla v. Beard, 545 U.S. 374 (2005) By According Strategic Deference to Counsel's Challenged Decision Despite a Contemporaneous Record That Petitioner Contends Did Not Provide the Factual Foundation Necessary for Informed Professional Judgment .................................. 9

A. Governing Supreme Court Standard .................................................... 9

B. The State Court's Adjudication .................................................... 10

C. The Contemporaneous Voir Dire Record .................................................... 14

D. The State Court's Strategic Deference Analysis was Unreasonable ...................... 15

E. Application of AEDPA .................................................... 18

F. Prejudice Under Strickland .................................................... 20

GROUND TWO .................................................... 23

The State Court Unreasonably Applied Strickland v. Washington, 477 U.S. 668 (1984), By Concluding That Counsel's Handling of Testimonial Accusation Evidence Introduced Through Detective Tedesco Constituted Objectively Reasonable Professional Assistance .................................................... 23

A. Governing Supreme Court Standard .................................................... 23

B. Detective Tedesco's Testimony .................................................... 23

C. The State Court Unreasonably Applied Strickland .................................. 25

D. Application Of AEDPA .......... 27

E. Prejudice Under Strickland .......... 28

GROUND THREE .......... 31

Strickland's Totality Of The Evidence Framework Governs The Prejudice Analysis If More Than One Strickland Performance Deficiency Is Independently Established In The Same Representation .......... 31

A. Governing Supreme Court Standard .......... 31

B. The State Court's Application Of Strickland .......... 32

GROUND FOUR .......... 52

The Admission Of A Testimonial Accusation From A Non-Testifying Complainant Violated The Confrontation Clause, And Petitioner Contends That The State Court's Harmless-Error Adjudication Does Not Withstand Review Under 28 U.S.C. §2254(d) Or The Governing Federal Habeas Standards .......... 52

A. The State Court's Harmless-Error Adjudication .......... 52

B. Respondent's Procedural Default Defense Is Overcome By Cause And Prejudice .......... 53

C. Governing Supreme Court Standards .......... 54

D. The Contemporaneous Trial Record .......... 57

E. The State Court's Harmless-Error Analysis Was Unreasonable .......... 57

CERTIFICATE OF APPEALABILITY .......... 61

CONCLUSION .......... 64

PRAYER FOR RELIEF .......... 66

# TABLE OF AUTHORITIES

FEDERAL CASES PAGE(S)

Brecht v. Abrahamson,
507 U.S. 619 (1993) ................................55, 56, 59, 62

Brinson v. Walker,
547 F.3d 387 (2d Cir. 2008)....................................60

Brown v. Davenport,
596 U.S. 118 (2022) ....................................56, 58, 62

Chapman v. California,
386 U.S. 18 (1967) .........................................55, 62

Coleman v. Thompson,
501 U.S. 722 (1991)............................................53

Cornell v. Kirkpatrick,
665 F.3d 369 (2d Cir. 2011) ...................................48

Crawford v. Washington,
541 U.S. 36 (2004) ..........................23, 29, 51, 55, 62

Delaware v. Van Arsdall,
475 U.S. 673 (1986) ...........................................56

Douglas v. Alabama,
380 U.S. 415 (1965)............................................55

Edwards v. Carpenter,
529 U.S. 446 (2000)............................................53

Eze v. Senkowski,
321 F.3d 110 (2d Cir. 2003) ...................................35

Fry v. Pliler,
551 U.S. 112 (2007) ...........................................56

Greene v. Fisher,
565 U.S. 34 (2011) ............................................55

Harrington v. Richter,
562 U.S. 86 (2011) .........................................23, 58

Hemphill v. New York,
595 U.S. 140 (2022) ...........................................55

Hinton v. Alabama,
571 U.S. 263 (2014) ........................................47, 48

Irvin v. Dowd,
366 U.S. 717 (1961) ...........................................10

Jackson v. Virginia,
443 U.S. 307 (1979) .................................... 46, 48

Kimmelman v. Morrison,
477 U.S. 365 (1986) .................................... 26, 48

Kyles v. Whitley,
514 U.S. 419 (1995) .................................... 30

Lafler v. Cooper,
566 U.S. 156 (2012) .................................... 36, 67

Miller v. Francis,
269 F.3d 609 (6th Cir. 2001) ........................... 12

Miller v. Webb,
385 F.3d 666 (6th Cir. 2004) ........................... 19, 22

Miller-El v. Cockrell,
537 U.S. 322 (2003) .................................... 61

Missouri v. Frye,
566 U.S. 134 (2012) .................................... 36, 67

Morgan v. Illinois,
504 U.S. 719 (1992) .................................... 10

Murray v. Carrier,
477 U.S. 478 (1986) .................................... 53, 54

O'Neal v. McAninch,
513 U.S. 432 (1995) .................................... 60

Orlando v. Nassau County District Attorney's Office,
915 F.3d 113 (2d Cir. 2019) ............................ 56

Perkins v. Herbert,
596 F.3d 161 (2d Cir. 2010) ............................ 33

Ponnapula v. Spitzer,
297 F.3d 172 (2d Cir. 2002) ............................ 46

Rivas v. Fischer,
780 F.3d 529 (2d Cir. 2015) ............................ 25

Rompilla v. Beard,
545 U.S. 374 (2005) ......................... 9, 15, 18, 22, 61

Ryan v. Miller,
303 F.3d 231 (2d Cir. 2002) ............................ 22

Slack v. McDaniel,
529 U.S. 473 (2000) .................................... 61

Smith v. Phillips,
455 U.S. 209 (1982) .................................... 10

Strickland v. Washington,
477 U.S. 668 (1984) 9, 15, 20, 23, 28, 30, 31, 32, 61, 62

United States v. Nieves,
58 F.4th 623 (2d Cir. 2023) .................................. 10

Wiggins v. Smith,
539 U.S. 510 (2003) ............................ 9, 15, 18, 22, 61

Wilson v. Sellers,
584 U.S. 122 (2018) .......................................... 2

Wood v. Ercole,
644 F.3d 83 (2d Cir. 2011) ................................ 33, 59

NEW YORK STATE CASES

People v. Campbell,
131 A.D.3d 882 (1st Dept. 2015) ....................... 29, 52, 53

People v. Campbell,
232 A.D.3d 479 (1st Dept. 2024) ....................11, 29, 32, 35

People v. Carroll,
95 N.Y.2d 375 (2000) ...................................... 45, 46

People v. Cassidy,
40 N.Y.2d 763 (1976) .......................................... 49

People v. Droz,
39 N.Y.2d 457 (1976) .......................................... 19

People v. Eastman,
85 N.Y.2d 265 (1995) .......................................... 53

People v. Gonzalez,
80 N.Y.2d 146 (1992) .......................................... 49

People v. Gray,
86 N.Y.2d 10 (1995) ........................................... 47

People v. Maffei,
35 N.Y.3d 264 (2020) .......................................... 11

People v. Miller,
11 A.D.3d 729 (3d Dept. 2004) ................................ 33

People v. Oathout,
21 N.Y.3d 127 (2013) .......................................... 33

People v. Patterson,
93 N.Y.2d 80 (1999) ........................................... 24

People v. Pennington,
27 A.D.3d 269 (1st Dept. 2006) .............................. 35

People v. Smith,
47 N.Y.2d 83 (1979) .............................................. 49

People v. Thompson,
21 N.Y.3d 555 (2013) ............................................ 11

People v. Torpey,
63 N.Y.2d 361 (1984) ............................................ 11

People v. Ugweches,
116 A.D.3d 440, 983 N.Y.S.2d 244 (1st Dept. 2014) .......... 25, 33

People v. Warrington,
28 N.Y.3d 1116 (2016) .............................. 12

People v. Weinstein,
42 N.Y.3d 439 (2024) ............................................ 39

People v. Wragg,
26 N.Y.3d 403 (2015) ............................................ 35

FEDERAL STATUTES

28 U.S.C. §2243 ................................................ 66

28 U.S.C. §2253(c) .......................................... 61, 68

28 U.S.C. §2254(d) .......................................... Passim

NEW YORK STATE STATUTES

Criminal Procedure Law § 60.25 .............................. 24

Criminal Procedure Law § 440.10 ........................... Passim

## QUESTIONS PRESENTED

1. The reasonableness, under 28 U.S.C. §2254(d), of the court's application of Strickland v. Washington, 477 U.S. 668 (1984), Wiggins v. Smith, 539 U.S. 510 (2003), and Rompilla v. Beard, 545 U.S. 374 (2005) to counsel's retention of prospective juror Mauline F. where the contemporaneous voir dire record reflected experiences directly related to the charged sexual allegations, expressed difficulty serving, counsel's proposed private discussion to which Mauline F. agreed but which never occurred, and no record supported professional judgment that further inquiry was unnecessary; independently, the objective reasonableness under Strickland of counsel's stated rationale for retaining Mauline F.; and the resulting prejudice inquiry under strickland.

2. The reasonableness, under 28 U.S.C. §2254(2), of the state court's application of Strickland to counsel's handling of Detective Tedesco's relay of a testimonial accusation from a non-testifying complainant, given counsel's recognition of hearsay and Confrontation Clause concerns, the accusation's continued presence before the jury without being stricken or limited, and the resulting Strickland prejudice inquiry.

3. The application of Strickland's totality of the evidence framework if the Court independently finds more than one preserved constitutional deficiency affecting the same trial result, including assessment of the prejudice consequences of those established deficiencies against the same trial record rather than as though each occurred in isolation.

4. The Confrontation Clause violation under Crawford v. Washington, 541 U.S. 36 (2004) arising from Detective Tedesco's relay of the non-testifying complainant's testimonial accusation; the extent to which constitutionally ineffective trial counsel supplies cause for the procedural default because the sustained Strickland deficiency includes the act or omission that produced the preservation failure, together with actual prejudice under Coleman v. Thompson, 501 U.S. 722 (1991) and Murray v. Carrier, 477 U.S. 478 (1986); the reaonableness, under 28 U.S.C. §2254(d), of the Appellate Division's Chapman harmless-error adjudication; and the substantial and injurious effect inquiry under Brecht v. Abrahamson, 507 U.S. 619 (1993).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROSS CAMPBELL,

Petitioner,

-against-

MARK MILLER,

Respondent.

25-cv-6001 (JGK)

REPLY

REPLY TO THE STATE'S ANSWER AND MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS

PRELIMINARY STATEMENT

Respondent's Answer principally rests on AEDPA deference, which is the proper starting point. Federal review is narrow by design, and Petitioner doesn't ask this Court to retry the case, correct ordinary error of state law, or substitute its judgment for that of the state courts.

The governing task is more exacting: measure the operative state court adjudications against clearly established Supreme Court law and the record that was before those courts. See, 28 U.S.C. §2254(d). Deference remains substantial, but it operates within that framework; it doesn't replace examination of the reasoning and record on which the state court judgment rests. That record limitation is claim specific. In applying §2254(d), Petitioner relies on the evidence properly before the state court whose adjudication of the particular federal claim is under review and doesn't ask this Court to use later developed evidence to retroactively render an earlier state court adjudication unreasonable.

Supreme Court holdings supply the clearly established federal law under §2254(d)(1); lower court and state court decisions are invoked for persuasive support or relevant state law context.

The same discipline identifies the decision under review claim by claim. Federal habeas courts presumptively look through an unexplained state court ruling to the last related decision that supplies a reasoned explanation, while giving effect to reasons a later court actually provides. See, Wilson v. Sellers, 584 U.S. 122, 125 (2018). Therefore, the §440 litigation cannot be treated as one undifferentiated adjudication. The First Department's November 14, 2024 order is the later merits adjudication. Where it supplied its own rationale, that rationale is operative; where a preserved subclaim was resolved without separate subclaim specific reasoning, Wilson's look through presumption points to the last related reasoned explanation, absent rebuttal.

Justice Marcus' December 19, 2019 order supplied specific reasoning on the earlier record based ineffective assistance subclaims. In rejecting the element specific Rape and Criminal Sexual Act theories, Justice Marcus relied substantially on the Appellate Division's prior sufficiency determination; he also separately rejected the kidnapping merger and missing witness theories. (REXH V at 7-11). Additionally, Justice Lieb's June 9, 2022 decision supplied the developed post-hearing reasoning on Mauline F., the letter issues, Detective Tedesco, the plea process, and the representation considered as a whole. AEDPA review should therefore identify the relevant state court rationale for each preserved subclaim rather than treating the §440 history as a single ruling.

Respondent emphasizes the number of prior New York court rulings rejecting Petitioner's claims. However, the number of prior rulings doesn't alter the statutory inquiry. Respectfully, section 2254(d) directs this Court to the reasonableness of the operative adjudication under clearly established federal law and the state court record, not to a count of the judges who previously reached

the same result.

Operating within that framework, this Reply presents four related issues. Grounds One, Two, and Four set out asserted bases for relief. Ground Three addresses the combined prejudice analysis that becomes material only if the Court independently finds more than one preserved deficiency in counsel's performance under Strickland affecting the same trial result. The Reply organizes those issues by subject rather than by the Petition's numbering. Thus, Grounds One through Three arise from the ineffective assistance claims pled in Ground One of the Petition; Ground Four presents the Confrontation Clause claim pled in Ground Two. The freestanding due-process claim concerning prospective juror Mauline F. and the corcam nobis claim pled in the Petition's Grounds Three and Four aren't separately developed here because they seem procedurally defaulted. Nothing in this Reply should be construed as a voluntary withdrawal or abandonment of a claim pleaded in the Petition. The related, exhausted ineffective assistance theory concerning Mauline F. remains preserved and is addressed in Ground One.

## Preservation Of Ground One

This Reply develops at length the ineffective assistance theories that principally require further response to Respondent's Answer, but Petitioner doesn't thereby withdraw or abandon any ineffective assistance subclaim properly pleaded in Ground One of the Petition. Thus, except where Petitioner expressly states that a claim itself is withdrawn, the component claims set forth in Ground One including counsel's handling of voir dire and Mauline F.; the testimonial accusation attributed to Betsy V.; the Angela V. letter and Walsh letters; counsel's failure to present the pleaded element specific dismissal arguments concerning the Rape, Criminal Sexual Act, and Kidnapping counts; the missing witness issue; summation and stipulation related errors; sentencing representation; and plea communications remain submitted as pleaded in the Petition and on the state court record. Nothing

in this preservation paragraph concedes Respondent's procedural or merits objections. Discussion of a pleaded subclaim in this Reply as part of prejudice, harmlessness, evidentiary context, or Strickland's totality analysis doesn't convert that claim into a new ground or constitute its abandonment.

The state appellate record confirms that the preserved secondary Ground One subclaims were carried forward rather than left behind in Supreme Court. In the perfected First Department appeal, Petitioner expressly argued counsel's failure to present the Rape and Criminal Sexual Act dismissal motions, the kidnapping merger motion, and the missing witness request, and incorporated the remaining ineffective assistance arguments from the §440 motion, reply, and earlier leave application. (REXH HH at 50-54). The same brief stated expressly that "each and every claim of ineffective assistance made herein is brought under both the Federal and State Constitutions." (Id. at 27 n.3). The December 12, 2024 Court of Appeals leave letter then sought review of "all points raised in the courts below," expressly disclaimed waiver or abandonment, and relied on the lower briefs and moving papers as to issues not separately discussed. (REXH LL at 1). Granted, those filings don't eliminate Respondent's ability to contest any distinct procedural requirement, but they materially support treating the other properly presented Ground One subclaims as carried forward rather than abandoned.

Furthermore, Petitioner relies on those filings not merely to show nonabandonment, but to identify the state court presentation through, which the preserved ineffective assistance subclaims were fairly presented as federal constitutional claims. Respodnent's procedural objections must be evaluated claim by claim against those filings and the actual state court record.

## STATEMENT OF THE ARGUMENT

The first constitutional problem arose well before the first witness ever took the stand. During voir dire, prospective juror Mauline F. disclosed personal experiences directly related to the charged sexual allegations; explaining that she was twice the victim on an extremely traumatic event. Rape. She said that she'd been almost raped while on a date and, the other instance was at the hands of her husband. She further expressed that, the discussion had resurfaced those memories, and she said would have difficulty serving. When counsel asked if whether she'd like to speak to the judge privately, Mauline F. answered yes. However, that conversation never occurred and, she was seated without the contemplated private follow-up inquiry becoming juror number 8.

Years later, trial counsel testified that the wanted Mauline F. on the jury and, when asked about her disclosures, said, "I think she was lying, period." Ground One doesn't ask the Court to presume that Mauline F. was actually biased. It asks the narrower Strickland question presented by the record: the state court accorded strategic deference to a decision made without completing the private follow-up inquiry counsel had proposed and Mauline F. agreed to, and then accepted a rationale resting on counsel's personal assumptions about the credibility of sexual assault disclosures. Petitioner doesn't contend that the absence of further inquiry alone establishes deficient performance; he contends that, on this record, the state court couldn't reasonably treat the decision as informed professional judgment without a record supported professional basis for concluding that the contemplated inquiry was unnecessary. Petitioner further contends that, counsel's stated rationale independently failed Strickland's requirement of objectively reasonable professional judgment.

The second problem arose during the People's case when Detective Tedesco relayed an accusation from Betsy V., a complainant who never testified: "That's the

one who told the fat kid to rape me." Counsel objected and told the court he'd address the matter on cross-examination, but the accusation was never effectively revisited, stricken, or limited by instruction. Before any §440 hearing testimony existed, Justice Marcus stated that counsel "should have objected to or moved to strike" the lineup statements. Ground Two contends that the later state court decision unreasonably treated counsel's handling of that accusation as objectively reasonable professional assistance under Strickland, even though the statement remained before the jury throughout deliberations. The resulting prejudice must be measured against a record in which no physical evidence or forensic evidence connected Petitioner to a sexual offense against Betsy V., codefendant Walsh supplied the principal direct account of Petitioner's alleged conduct toward her, and the corroborative detail identified by Respondent was disputed by another prosecution witness who was present in the apartment.

Those two events didn't occur in separate cases. They were part of the same representation, before the same jury, in a trial whose Betsy V. related charges depended heavily on contested witness testimony. Ground Three therefore doesn't assert a freestanding cumulative error doctrine. If the Court independently finds more than one preserved deficiency in counsel's performance under Strickland affecting the same trial result, Ground Three asks that the prejudice consequences of those established deficiencies be assessed against the same totality of evidence rather than be treated as though each occurred in isolation. That context matters here because Walsh was the witness who described Petitioner's alleged sexual conduct toward Betsy V. and the alleged gunpoint coercion tied to the charged Betsy V. related sexual offenses; when counsel returned to the District Attorney's statement under discussion and asked whether it was accurate, Walsh answered, "Majority of it isn't;" and the the corroborating detail identified by Respondent was materially contested by another prosecution witness who was present in the apartment.

Ground Four addresses Detective Testimony from a different constitutional angle. Petitioner contends Betsy V.'s accusation was testimonial because it was made to law enforcement during a formal lineup in the investigation of the charged conduct; she didn't appear at trial, and Petitioner had no prior opportunity to cross-examine her. The Appellate Division found the Confrontation Clause claim unpreserved but also held, in the alternative, that the error was harmless beyond a reasonable doubt. Respondent invokes the preservation ruling as a procedural bar; Ground Four answers that defense through cause and prejudice, relying on the exhausted trial counsel claim in Ground Two. A ruling sustaining Ground Two establishes direct entitlement to relief on that Strickland claim; it also supplies cause to reach Ground Four to the extent the sustained Strickland deficiency includes the failure that produced the Confrontation Clause preservation default. On the merits, relief still requires satisfaction of AEDPA review of the state court's Chapman determination and Brecht's substantial and injurious effect standard. The same concrete consequences: the accusation remaining before the jury without exclusion or limitation, the jury notes seeking clarification on complainant attribution and lineup evidence, and the contested strength and source independence of the properly admitted Betsy V. proof bear on the Strickland prejudice inquiry and, separately, on actual prejudice and Brecht. The jury's own notes are part of that inquiry: during deliberations, it asked which complainant the rape and criminal sexual act counts concerned, requested lineup photographs, and sought furhter guidance concerning the evidence supporting the sexual offense counts.

Therefore, the argument doesn't depend on a broad claim that the trial was generally unfair, on speculation about what Mauline F. might have said if questioned, or on treating every disputed ruling as constitutional error. Each Ground rests on a defined legal standard and a concrete part of the contemporaneous record. Ground One concerns the factual basis for strategic deference; Ground Two concerns counsel's actual handling of a testimonial accusation; Ground Three

concerns the prejudice consequences of any independently established deficiencies under Strickland's totality of the evidence standard; and Ground Four concerns confrontation, procedural default, AEDPA harmless-error review, and Brecht.

The record supplies the through line. Because, it shows what counsel knew, what counsel did, what the jury heard, and what the jury asked about before returning its verdict. The Grounds that follow apply the governing Supreme Court standards to those facts and explain why Petitioner contends the resulting state court adjudications cannot withstand the review required by 28 U.S.C. §2254(d).

## GROUND ONE

The State Court Unreasonably Applied Strickland v. Washington, 477 U.S. 668 (1984), Wiggins v. Smith, 539 U.S. 510 (2003), and Rompilla v. Beard, 545 U.S. 374 (2005) By According Strategic Deference to Counsel's Challenged Decision Despite a Contemporaneous Record That Petitioner Contends Did Not Provide the Factual Foundation Necessary for Informed Professional Judgment.

### A. Governing Supreme Court Standard

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. See, Strickland v. Washington, 466 U.S. 668 (1984). Review of counsel's performance is deferential, and courts must avoid evaluating strategic decisions through hindsight; but deference is owed only to decisions reflecting reasonable professional judgment under the circumstances counsel faced, grounded in their reasonable investigation or a reasonable professional judgment that further investigation was unnecessary. Strickland at 690-91.

Wiggins v. Smith, 539 U.S. 510 (2003), and Rompilla v. Beard, 545 U.S. 374 (2005), confirm that strategic choices are entitled to deference only to the extent supported by reasonable professional judgments about the scope of investigation; where the factual foundation for an informed decision was never adequately developed, the strategic explanation itself is subject to scrutiny under Strickland. Accordingly, the constitutional deficiency which Petitioner identifies isn't that the record remained incomplete in some general sense, but that counsel's strategic judgment rested upon factual development that never occurred, despite counsel having the opportunity to obtain it before deciding. Although Wiggins and Rompilla arose in capital sentencing, the principle that, strategic deference presupposes a sufficient factual predicate, derives from Strickland itself and is not confined to that context.

The Sixth Amendment separately guarantees trial before an impartial jury, and meaningful voir dire serves to identify circumstances bearing on a prospective juror's impartiality. See, Irvin v. Dowd, 366 U.S. 717 (1961); Smith v. Phillips, 455 U.S. 209, 217(1982); Morgan v. Illinois, 504 U.S. 719(1992). Petitioner doesn't rely on Irvin, Smith, or Morgan as independent grounds for relief; they supply context for evaluating counsel's performance under Strickland. Nor does Petitioner contend that Mauline F.'s disclosures established actual bias as a matter of law or that federal law mandated her removal. Their relevance is narrower: meaningful voir dire inquiry develops the facts needed to evaluate impartiality in the first place. See, United States v. Nieves, 58 F.4th 623, 631-33(2d Cir. 2023)(cited only as persuasive authority concerning that practical function).

Under 28 U.S.C. §2254(d), the relevant issues is the reasonableness of the state court's conclusion that counsel exercised informed professional judgment despite a contemporaneous record showing disclosures directly related to the charged allegations, a request for additional discussion, and no further inquiry. The claim doesn't depend on showing that another attorney necessarily would have exercised a peremptory challenge.

B. The State Court's Adjudication

The §440 court treated counsel's decision to seat Mauline F. as strategy and gave it substantial Strickland deference. It credited counsel's later testimony that he wanted Mauline F. on the jury because he believed her experiences and demeanor might help the defense in deliberations. That testimony belonged in the analysis, but it couldn't end it. Under §2254(d), the remaining question is whether the state court reasonably treated the decision as informed professional judgment when measured against the record counsel actually had during voir dire.

Petitioner contends it did not. The state court accepted the later strategic explanation without adequately reconciling it with the contemporaneous record on

which any informed judgment had to rest. Under Strickland, a strategic explanation doesn't end the constitutional analysis. Deference depends on an informed professional judgment based on information reasonably available when the decision was made. Likewise, Wiggins and Rompilla tie strategic deference to reasonable investigation and informed judgment.

The state court's reliance on People v. Maffei, 35 N.Y.3d 264(2020), highlights the problem. Maffei found no actual bias where the juror never explained what caused his uneasiness or tied it to a personal experience. Id at 271. Mauline F. did the opposite. She identified the source of her concern, two personal experiences of rape, and connected it directly to the subject matter of the trial. Likewise, New York law treats an unrebutted statement that a personal experience would create a problem serving impartially as significant. See, People v. Torpey, 63 N.Y.2d 361, 367-68 (1984).

When Respondent says Mauline F. was not shown to be "inclined to convict Petitioner baselessly to avenge past wrongs done to her," he answers a broader claim than Petitioner makes. No such motive need be proven, because the narrower concern is that, Mauline F.'s own experiences could affect her impartiality in a rape trial even without conscious animus. That is the concern that the inquiry was positioned to test. Therefore, Petitioner seeks no freestanding finding that Mauline F. was actually biased. Because, the point is simpler: the authorities the state court invoked treat the nature and personal connection of a juror's disclosure as important, and Mauline F.'s disclosure fell squarely within that concern. That mismatch bears on the reasonableness of the state court's Strickland analysis.

The Appellate Division's reliance on People v. Thompson, 21 N.Y.3d 555(2013), in its November 14, 2024 order affirming the denial of Petitioner's CPL §440.10 motion, People v. Campbell, 232 A.D.3d 479 (1st Dept. 2024), is similarly

distinguishable. Thompson involved a prospective juror whose disclosed circumstances was a friendship with the prosecutor and a record of which counsel's retention decision could be evaluated. Mauline F. presented a materially different problem: she described being almost raped while on a date and on another occasion being raped by her husband in a trial charging Rape and Criminal Sexual Act, said those memories were resurfacing, expressed difficulty serving and agreed to speak privately when counsel asked, but no private discussion occurred. The point isn't that Thompson required Mauline F.'s removal. It's that Thompson doesn't answer the antecedent Strickland question presented here: whether counsel had developed enough information to make the retention decision an informed professional judgment. The Appellate Division's citation to Thompson therefore cannot substitute for examination of the undeveloped voir dire record.

Respondent's reliance on Miller v. Francis, 269 F.3d 609 (6th Cir. 2001), is distinguishable for the same reason. Because, there, after the prospective juror disclosed case related information, the trial court conducted a separate in camera examination at which the court, prosecutor, and defense counsel questioned her about the source and extent of her knowledge, her relationship with the complainant's mother, and her ability to remain impartial; the juror repeatedly stated that she could be fair. (Id at 614-18). Whereas, here, after counsel proposed private questioning and Mauline F. agreed, the corresponding private inquiry never occurred, and no comparable questioning tested the effect of her resurfacing memories or stated difficulty before counsel retained her. Thus, Miller doesn't supply clearly established federal law under §2254(d)(1); as Respondent's own persuasive analogue, however, it developed voir dire record highlights the factual development that preceded the strategic decision there and is absent here.

People v. Warrington, 28 N.Y.3d 1116, 1119-20 (2016), illustrates the same distinction from the opposite direction. There, targeted follow-up questioning and affirmative rehabilitation preceded the juror's retention. Here, however, after

Mauline F. agreed to speak privately when counsel asked, no private follow-up occurred, and no inquiry tested her stated difficulty against her ability to serve impartially. Warrington doesn't supply clearly established federal law; it provides state law context for the developed record that informed retention can require and is absent here.

The People's post-hearing memorandum defended counsel's decision by pointing to the "timing of the juror's disclosure of sexual abuse, her mannerisms during voir dire, and the disclosed case against her husband" (REXH X at 16 n.6). The contemporaneous voir dire record, however, shows that after counsel asked about Mauline F.'s work/time concern, Mauline F. confirmed it and then volunteered, "And I also wanted to say," before disclosing the two sexual assault experiences and explaining that discussion of the case had caused the memories to resurface. (Trial at 187-188). Counsel then asked whether she'd have difficulty serving, and Mauline F. answered yes. To the extent the timing of Mauline F.'s disclosure is offered as an objective basis for discounting her credibility, the transcript shows a disclosure volunteered during counsel's questioning, not an unexplained late addition.

A strategy articulated years later doesn't answer that problem. The issues is not counsel's ability to give the decision a label; it's the reasonableness of the state court's conclusion that the decision was informed when tested against the record that existed at the time. That is the center of Ground One. Mauline F.'s disclosure, her agreement to speak privately when counsel asked, the failure to complete that discussion, and the surrounding voir dire provide the record against which AEDPA requires the state court's Strickland ruling to be measured.

The sections that follow address those contemporaneous circumstances and explain why petitioner contends the state court's adjudication involved an unreasonable application of clearly established Supreme Court precedent and, where applicable, and unreasonable determination of the facts within the meaning of 28 U.S.C. §2254(d).

### C. The Contemporaneous Voir Dire Record

The record begins with what Mauline F. actually said. During voir dire, she said she had been almost raped on a date and a later rape by her husband. She explained that the case had brought those memories back and that she was having difficulty because of them. Those disclosures went directly to the subject matter the jury would asked to decide. (Voir Dire at 187-188).

Counsel then asked Mauline F. whether she would like to speak to the judge privately, and Mauline F. answered yes. That conversation never happened. No follow-up tested how the resurfacing memories affected her ability to serve before she was seated. Counsel had received the disclosure and chose to rely on his own assessment of Mauline F.'s credibility. Petitioner therefore identifies counsel's failure to complete the contemplated private inquiry as the omission, and not any independent duty of the court to act on its own.

The record further reflects why that discussion never occurred. When counsel later identified Mauline F. for private discussion, the following exchange took place:

> THE COURT: She did say--well, if she comes in here, I think she's going to say that she may lose her job if she's out too long. She's got to produce.
>
> MR. GARAFOLA: That's the one, Judge.
>
> THE COURT: Well, unless she has something to add. I don't think she wanted to add anything, other than she expressed her concern to lose her job. (Voir Dire at 205).

What happened next explains why the missing inquiry matters. When counsel later identified Mauline F. for private questioning, the court remembered only her concern about losing her job. Counsel answered, "that's the one, Judge." instead of reminding the court of the sexual assault disclosure and Mauline F.'s desire to speak privately. The sexual assault disclosure disappeared from the discussion at the precise moment clarification was available. The contemplated private

conversation never occurred. The point isn't that Mauline F. had to be removed; it is that the information needed to evaluate her disclosure was never developed before counsel chose to keep her.

The same voir dire shows how readily that information could've been developed. Because, when a concern arose about prospective juror Shiwram, defense called it "highly prejudicial" and "not fair to [Petitioner]," the prosecutor even the prosecutor asked the court to "flesh it out," and the court asked more questions before deciding whether she could serve. (Voir Dire at 397). Mauline F. and Shiwram needn't be identical. The comparison shows that follow-up inquiry was an available and familiar tool in this very jury selection, yet it wasn't used after Maunline F. said she'd twice been the victim of sexual assault, one attempted while on a date and the other at the hands of her husband, said she was having difficulty, and answered yes when counsel asked whether she wanted to speak to the judge privately. (Voir Dire at 187-188 and 396-403).

## D. The State Court's Strategic Deference Analysis Was Unreasonable

Ground One therefore turns on the record that existed when counsel made the decision, not on the mere fact that counsel later described the decision as strategic. AEDPA remains controlling but, the state court's deference must still be reasonable in light of that record.

The §440 credited counsel's testimony that he wanted Mauline F. on the jury because he thought she might help the defense. And, it treated that explanation as a strategic judgment entitled to substantial deference. However, the problem is that the analysis effectively stopped once the court treated the decision as strategy. Strickland v. Washington, 477 U.S. 668 (1984), Wiggins v. Smith, 539 U.S. 510 (2003), and Rompilla v. Beard, 545 U.S. 374 (2005) require more than a strategic label. They require a reasonable factual basis for professional judgment, or a reasonable judgment that further investigation was unnecessary. Petitioner contends neither is reflected here: Mauline F. disclosed experiences directly tied

to the charges, said she was having difficulty, agreed to speak privately when counsel asked, and was seated before that discussion occurred.

The missing conversation was not peripheral. It was the obvious means of learning what Mauline F. meant by "difficuly" and whether those resurfacing memories would affect her ability to serve. Without it, the later strategic explanation rested on a materially incomplete contemporaneous record.

Counsel's treatment of the rest of the panel makes Mauline F.'s treatment more striking. Because during the same jury selection, counsel secured the removal by cause, peremptory challenge, or consent of every other prospective juror who disclosed a connection to sexual offenses, even when the connection was only through a friend, family member, profession, or general emotional reaction. (REXH S at 16-17). Thus, Mauline F., who said she'd almost been raped while on a date and was actually raped by her husband, was the sole exception.

Granted, Respondent can fairly argue that this pattern shows counsel was attentive and that Mauline F.'s retention was deliberate. But, the specific record of Mauline F.'s treatment points the other way because: when counsel later identified Mauline F. for private questioning, he confirmed the court's recollection of her work concern and didn't remind the court of the sexual assault disclosure or her agreement to speak privately. Therefore, the comparison supplies a concrete benchmark, not a presumption. In fact, it shows the level of attention counsel gave similar concerns elsewhere and the different treatment Mauline F. received.

Shiwram provides the clearest example because, when she disclosed a family connection to sexual abuse, counsel said "Judge, I'm going to have to object if she has that kind of bias," and that "[he] thinks it's highly prejudicial to [Petitioner]" ..."especially when she finally came clean with her true feelings." And, that he "...don't think that it's fair to [Petitioner]." (Voir Dire at 397). That concern prompted the follow-up missing with Mauline F. The jurors needn't be

legally identical for counsel's own contemporaneous practice to matter. Mauline F.'s own disclosures, being almost raped while on a date and actually be raped by her husband, didn't obviously fall outside the concern counsel himself articulated.

Nor does the timing of Mauline F.'s disclosure supply a reliable distinction. Because after counsel asked about her work/time concern, Mauline F. confirmed it and then volunteered, "And I also wanted to say," before disclosing the sexual assaults and explaining that the case discussion had resurfaced those memories. Counsel then asked whether she'd have difficulty serving, to which she answered yes. (Voir Dire at 187 Lns 11-25 and 188 Lns 1-4). Thus, on this record, the sequence was a contemporaneous disclosure during counsel's questioning, not an unexplained delay bearing on credibility.

The Court needn't decide how another lawyer would've used a peremptory challenge. Because, the narrower AEDPA question is whether the state court reasonably gave dispositive strategic deference without confronting the incomplete factual foundation reflected in the voir dire record. That question can be answered from the record as it stands: the contemplated private inquiry never occurred.

The record also isn't silent about counsel's own thinking. Petitioner testified that he told counsel Mauline F. "would probably be no good" because "she was a victim of a similar crime that was being alleged in the indictment." And, that counsel replied "Relax. I got this." (Hearing at 55). More importantly, counsel later testified that he believed Mauline F. was "not truthful about being almost raped on a date," that "...there is no such thing as attempted rape on a date," and "...[he] doesn't think that constitutes rape." Also, because Mauline F. is "...still with her husband I she was [l]ying, period." Additionally, he also testified that he wanted Mauline F. on jury and described her as his "insurance policy for at least a mistrial." (Hearing at 117-121). The Court therefore can test counsel's stated rationale against the contemporaneous voir dire record without inventing an unstated explanation.

The broader trial record also shows that counsel knew how to pursue factual clarification when he chose to do so. This is evident in the separately charged Clarice J. episode where he, obtained concessions from lead Detective McMahon. McMahon confirmed that: the "money phone (347)330-3253," which Clarice J. said was the use to receive calls for dates and belonged to Petitioner (Trial at 545), in fact belonged to Lissette Bonaventre (Trial at 806-807), and was disconnected on 5/3/2008 (Trial at 819-820). Additionally, counsel also was able to have computer forensic examiner Detective Dibattista concede photo information and inability to attribute ownership of certain physical **evidence.** (Trial at 866-875). That contrast reinforces the point here: follow-up inquiry was an available and familiar advocacy tool, yet the contemplated private inquiry with Mauline F. was left undeveloped.

The gap was visible even before the §440 hearing. Because, at the 2017 Court of Appeals oral argument, Judge Fahey asked: "All right. So what about the question of why the Court conducted no further inquiry? Isn't that a dispositive question? There clearly seems to be something wrong. The Court conducted no inquiry at all." (REXH S at Exhibit B at 13). Petitioner cites the exchange only as confirmation that the omission was apparent on the direct appeal record, not as legal authority.

For those reasons, the state court adjudication involved an unreasonable application of Strickland, as further explained by Wiggins and Rompilla, and shouldn't be accorded deference under 28 U.S.C. §2254(d).

E. Application of AEDPA

AEDPA's deference is controlling, not incidental, to Ground One. Federal habeas relief in unavailable merely because this Court might have assessed the juror or counsel's strategy differently on direct review. The Court therefore needn't reassess Mauline F. de novo, substitute its own peremptory strategy, or reconstruct the voir dire as if on direct appeal.

The state court's ruling must be tested against four simple facts: Mauline F. disclosed experiences directly related to the sexual charges; she said she was having difficulty; she agreed to speak privately when counsel asked; and the conversation never occurred before counsel treated his assessment as informed. Each fact can be viewed separately. Together, they describe a record materially different from one in which counsel investigated the concern and then made a strategic choice on a developed record. Those facts matter without any finding of actual bias or speculation about what Mauline F. would have said because, the question is whether counsel had a reasonable factual basis for treating further inquiry as unnecessary.

Ground One presents two deficiency theories. First, counsel made the retention decision before the contemplated private inquiry developed the facts needed to assess Mauline F.'s impartiality. Second, counsel's stated reason for discounting Mauline F.'s disclosure independently must satisfy Strickland's requirement of objectively reasonable professional judgment. Either theory concerns deficient performance; both remain subject to Strickland's separate prejudice requirement.

Counsel's own explanation supplies the second theory. When asked about Mauline F.'s disclosures, counsel testified, "I think she was [l]ying, period." (Hearing at 120). His explanation also rested on his view that what Mauline F. described as being almost raped while on a date didn't constitute rape and on his belief that a wife wouldn't remain with a husband who committed rape against her. (Hearing at 120-121). A strategic choice isn't insulated from Strickland merely because counsel can describe it later. Petitioner contends that a credibility judgment resting on personal assumptions about how sexual assault survivors behave isn't reasonable professional judgment. See, Miller v. Webb, 385 F.3d 666, 675-76 (6th Cir. 2004)(persuasive authority); People v. Droz, 39 N.Y.2d 457, 462 (1976).

Justice Lieb expressly recognized the problem stating: "Although this Court does not support the apparent views of trial counsel, it still concludes that trial

counsel's choices were strategic, based on his view that the juror would be disruptive." (REXH Z at 26 n.17). The unanswered point is why a decision resting in part on the credibility assumptions counsel actually articulated nevertheless qualified as the informed professional judgment Strickland requires. This second theory, like the first, doesn't depend on proving Mauline F. was actually biased. It asks only that counsel's stated basis for discounting her disclosure be judged as professional reasoning rather than accepted because it was called strategy.

Section 2254(d) doesn't turn on counsel's ability to articulate a strategy after the fact. The state court unreasonably treated the challenged decision as informed professional judgement despite the contemporaneous record and counsel's stated rationale.

For these reasons, the adjudication of this claim involved an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. §2254(d)(1). Any reliance on §2254(d)(2) is limited to a specific factual determination actually made by the state court and shown unreasonable in light of the state court record; disagreement with the legal significance of undisputed voir dire facts proceeds under §2254(d)(1).

F. Prejudice Under Strickland

Strickland separately requires prejudice: a reasonable probability that, but for counsel's deficient performance, the result would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. Strickland v. Washington, 466 U.S. 668, 694 (1984).

The prejudice analysis doesn't depend on guessing how Mauline F. would have answered the questions that were never asked or on presuming actual bias. The omission itself doesn't establish Strickland prejudice. Petitioner must connect the failure to complete the inquiry to a reasonable probability sufficient to undermine

confidence in the outcome. The prejudice analysis begins with the facts the record actually supplies. Mauline F. disclosed two experiences directly related to the charged sexual allegations, said the case had resurfaced those memories, expressed difficulty serving, agreed to speak privately when counsel asked, and was seated before that inquiry occurred. This is therefore not a claim that counsel simply should've asked one more question.

Nor must Petitioner prove that additional questioning guaranteed Mauline F.'s removal. Strickland asks for a reasonable probability sufficient to undermine confidence in the result. The unresolved risk isn't itself prejudice, and Petitioner doesn't ask the Court to treat it as such. Its relevance arises within Strickland's totality inquiry: counsel seated a juror who had identified difficulty with the charged subject matter without obtaining the contemplated clarification, in a credibility driven trial. Petitioner submits that, when that circumstance is considered with the evidence actually presented and any other independently established deficiency, it is sufficient to undermine confidence in the outcome. That proposition doesn't depend on inventing an answer to questions never asked; it rests on the consequence of leaving a disclosed, case specific concern unresolved before the juror served.

Ground One doesn't treat prejudice as automatic. It asks that the voir dire deficiency be considered in the full trial context and, if other preserved deficiencies are also established, together with them under the totality framework explained in Ground Three.

On that limited basis, and not on the missing inquiry standing alone, Petitioner submits that the state court's no prejudice conclusion was an unreasonable application of Strickland when the unresolved voir dire concern is assessed against the full trial record.

## G. Conclusion

Ground One asks for neither a finding of actual bias nor a rule that counsel had to strike Mauline F. It asks the Court to test the state court's deference against the record counsel actually had and the reason counsel actually gave. That record supports two distinct deficiency theories: the contemplated private inquiry never occurred before the facts necessary for an informed judgment were developed, and counsel's stated reason for discounting Mauline F.'s disclosure rested on personal assumptions, which Petitioner contends were professionally unreasonable. Miller v. Webb, 385 F.3d 666 (6th Cir. 2004) provides persuasive support for the second point; Strickland supplies the governing standard. Strickland prejudice remains a separate requirement.

The same voir dire make the first theory concrete. Mauline F. disclosed two sexual assaults, said the memories were resurfacing, expressed difficulty, and agreed to speak privately when counsel asked. Counsel had used further inquiry elsewhere in the same jury selection when comparable concerns arose. But, with Mauline F., that inquiry never happened.

AEDPA doesn't permit this Court to substitute its preferred jury selection strategy. But, it does require a reasonable state court application of Strickland to those facts. Therefore, Petitioner submits that Ground One satisfies §2254(d)(1) under Strickland, as further explained by Wiggins and Rompilla. Miller v. Webb remains persuasive only. If the operative adjudication also rested on an unreasonable factual determination actually made on the contemporaneous record, Petitioner separately invokes §2254(d)(2).

Ground Two addresses a different stage of the same proceeding: counsel's handling of testimonial accusation evidence relayed through Detective Tedesco by a complainant who didn't testify.

## GROUND TWO

The State Court Unreasonably Applied Strickland v. Washington, 477 U.S. 668 (1984) By Concluding That Counsel's Handling Of Testimonial Accusation Evidence Introduced Through Detective Tedesco Constituted Objectively Reasonable Professional Assistance.

### A. Governing Supreme Court Standard

The Sixth Amendment guarantees the effective assistance of counsel at every critical stage of a Criminal prosecution. Strickland v. Washington, 466 U.S. 668 (1984). A Petitioner must show both constitutionally deficient performance and resulting prejudice. Id. at 687. Review is highly deferential and must avoid the distorting effects of hindsight, but Strickland still requires that counsel's conduct reflect objectively reasonable professional judgment under the circumstances counsel faced.

Because the state court adjudicated this ineffective assistance claim on the merits, 28 U.S.C. §2254(d) adds a second layer of deference to Strickland. The Court therefore reviews the reasonableness of the state court's application of Strickland to the existing record, not counsel's performance de novo. Harrington v. Richter, 562 U.S. 86 (2011), requires substantial deference, but the record here isn't silent: it shows Detective Tedesco's testimony, counsel's response, and the accusation's continued presence before the jury.

Ground Two addresses only ineffective assistance; Ground Four separately addresses the Confrontation Clause violation and harmless error under Crawford v. Washington, 541 U.S. 36 (2004). Under §2254(d), the state court's conclusion that counsel's handling of Detective Tedesco's testimony was objectively reasonable must be measured against the trial record.

### B. Detective Tedesco's Testimony

Ground Two begins with a single piece of testimony from Detective Tedesco about a lineup involving Betsy V., who didn't testify at trial. First, Detective

Tedesco described the lineup and Betsy V.'s identification of codefendant Daniel Ebron. Upon solicitation by the court, he then relayed something more than an identification; an accusation attributed to Betsy V. herself. According to Detective Tedesco's testimony, Betsy V. stated:

"That's the one who told the fat kid to rape me."

The statement pointed to Ebron as "the one" and, in the same sentence, conveyed Betsy V.'s accusation that "the fat kid" was the person Ebron allegedly told to rape her. (Trial at 1034 Lns 22-25). Betsy V. never took the stand. The jury therefore heard the accusation through a detective, while the defense never had the opportunity to question the person who made it.

Beyond the constitutional concern, the admission of this testimony also violated New York Criminal Procedure Law §60.25, which permits a witness' prior lineup identification to be related through a third party only where the identifying witness is unable, based on present recollection, to make an in-court identification. Betsy V. didn't testify at all, and an absent witness isn't "unable" to identify within the meaning of the statute. See, People v. Patterson, 93 N.Y.2d 80, 82 (1999)(CPL §60.25 "does not allow third-party testimony confirming a pretrial identification by a nontestifying witness"). This statutory basis for objection existed independently of, and in addition to, the constitutional confrontation concern, and didn't require resolution of any unsettled question regarding the testimonial character of the statement.

Counsel did respond but, the transcript doesn't make the target of his objection clear. As the §440 court later recognized, the objection may have been directed to the accusation, to the lineup testimony more generally, or to some other part of the examination. (REXH Z at 30-31, n.22). What is clear, is the result. The accusation stayed in the case. It wasn't stricken. No limiting instruction told the jury to disregard it. It remained available during

deliberations.

Ground Two doesn't treat every unsuccessful objection or trial omission as ineffective assistance, and it doesn't depend on proving that counsel lacked every conceivable strategic reason for his response. Those concrete events, not a generalized complaint about trial tactics, frame Ground Two.

C. The State Court Unreasonably Applied Strickland

The concern was visible from the trial record before any §440 witness testified. Judge Marcus wrote in his December 19, 2019 order directing a hearing that, "Counsel should have objected to or moved to strike Detective Tedesco's reference to Betsy's line-up statements..." (REXH V at 13). The later hearing didn't produce a strategic explanation from counsel for leaving the accusation before the jury. Counsel instead confirmed that he regarded the testimony as "more than objectionable."(Hearing at 98).

The §440 court later denied relief after observing that it could "envision a strategic reason why a defense attorney might chose to lie---namely, so as not to draw further attention to it," even while calling its own reasoning "speculation." (REXH Z at 31). Richter requires federal courts to consider reasonable arguments that could support counsel's conduct, so the absence of a stated rationale is not enough by itself. The question is more practical: can any reasonable professional judgment account for the sequence the record actually shows?

Rivas v. Fischer, 780 F.3d 529, 547-52 (2d Cir. 2015), illustrates the application of Strickland under AEDPA in a post-Richter §2254 case in which the Second Circuit granted relief and concluding that no reasonable argument supported the state court's rejection of deficient performance and prejudice. Rivas doesn't supply the clearly established rule; Strickland does. See also, People v. Ugweches, 116 A.D.3d 440, 441 (1st Dept. 2014)(prejudicial hearsay left unaddressed without a record supported strategic basis).

Kimmelman v. Morrison, 477 U.S. 365, 384-85 (1986), reinforces the same distinction. The issue isn't the absence of a contemporaneous explanation as such; it is whether the conduct reflected reasonable professional judgment rather than an omission left unexplained by the record. Counsel's own hearing testimony makes the sequence harder to dismiss as tactical insignificance. He called the testimony "more than objectionable" and said he believed he had objected. (Hearing at 98-99). Yet, his description of the objection focused on defects in the lineup photographs and procedure, not on Betsy V.'s accusation itself. Those statements cut against treating the omission as a deliberate decision to leave the accusation before the jury.

The District Attorney's own post-hearing submission preserves the trial colloquy. Immediately after Detective Tedesco relayed Betsy V.'s accusation, counsel said, "Note my objection, Judge. I'll take that on cross-examination." The court answered, "Yes, you may inquire of the witness as to any circumstances surrounding that lineup." (REXH X at 25-26 quoting Trial at 1034-1035). The sequence strongly supports the inference that counsel intended to address the testimony that had just been given, but the transcript doesn't say in so many words that he promised challenge the accusation itself. Because, on cross-examination, counsel instead focused on the lineup procedure, including the absence of position markers on the photographs and the fact that another detective had taken them. Now, whatever tactical value that questioning had, the specific accusation wasn't revisited, stricken, or limited. But what matters under Strickland is, the affirmative sequence the record actually shows: counsel recognized a legal problem, objected, said he would take the matter up on cross-examination, received permission to inquire, and ultimately obtained no remedy for the accusation.

Counsel's hearing testimony narrows the field further. Because, he said he recognized both hearsay and Confrontation Clause problems when the testimony came in. (Hearing at 97-99). Therefore, the Court needn't speculate about whether competent counsel would have seen the issue; counsel says he did. Thus, the

remaining question is, why the recognized problem was left without an effective remedy.

Respondent argues that counsel may have chosen not to sharpen the objection or revisit the accusation because doing so could have highlighted it for the jury. Richter permits consideration of an unstated rationale only if it reasonably fits the affirmative record. Here, counsel regarded the testimony as "more than objectionable," objected when it came in, told the court he would take the matter or cross-examination received permission to inquire, and then left the accusation before the jury without exclusion or limitation. Ground Two therefore asks whether the state court could reasonably treat the handling shown by this record as professional judgment under Strickland. The practical consequence reinforces, but doesn't alone establish, the Strickland point: the accusation remained before the jury without an effective remedy.

This isn't an evidentiary vacuum. AEDPA deference applies to a record showing what counsel recognized, what he said he would do, what he did, and what the jury was left with.

D. Application of AEDPA

Review under 28 U.S.C. §2254(d) is intentionally deferential. Relief is unavailable merely because a federal court might have reached a different conclusion in the first instance; the state court adjudication must instead involve an unreasonable application of clearly established Supreme Court law or, where applicable, an unreasonable determination of the facts.

Ground Two therefore challenges no general rule about objections. It challenges the state court's deference to counsel on this record, where a testimonial accusation remained before the jury without being stricken or limited. Because the relevant events are preserved in the

V. "screaming and crying" being materially contested by Lissette Bonaventre's testimony; and the jury's later questions about complainant attribution and lineup evidence. The final charge also identified Crystal Aliaga, Lissette Bonaventre, and Walsh as accomplices. (Trial at 1239-1240). Multiple participating witnesses didn't automatically become multiple independent sources of non-accomplice corroboration merely because portions of their accounts overlapped. Those facts define the evidentiary setting in with the unremedied accusation remained before the jury.

The jury's own notes are part of that context. The Appellate Division said identity "was not a fundamental issue in the case." People v. Campbell, 131 A.D.3d 882 (1st Dept. 2015); See also, People v. Campbell, 232 A.D.3d 479, 480 (1st Dept. 2024). Yet, during deliberations the jury asked, as to the Rape and Criminal Sexual Act counts, "Is this in relation to Betsy and Angela?" (Trial at 1261-1262). It also requested lineup photographs of Petitioner and codefendant Ebron. The court clarified that those sexual offense counts concerned Betsy V. only. The notes do not reveal individual jurors' reasoning but, they do show that complainant attribution and lineup evidence were subjects on which the jury sought clarification.

Ground Three explains why that prejudice cannot be viewed in a vacuum if other deficiencies are also established. Ground Two addresses this omission on its own; Ground Three addresses its interaction with the rest of the representation.

Finally, Ground Four separately addresses the independent constitutional significance of the challenged testimony under Crawford v. Washington, together with the applicable harmless-error standards governing federal habeas review. This section is limited to the prejudice inquiry required by Strickland. The Appellate Division's Chapman harmless-error ruling doesn't answer Ground Two's Strickland prejudice inquiry. Chapman and Strickland ask different questions. Strickland requires a reasonable probability sufficient to undermine confidence in the outcome, not proof that the remaining evidence was insufficient or that a different

result was more likely than not. Strickland, 466 U.S. at 694; Kyles v. Whitley, 514 U.S. 419, 434-35 (1995).

The state court recognized that distinction when it ordered the evidentiary hearing, stating that "harmless error analysis is inapplicable to an ineffective assistance of counsel claim arising from counsel's performance at trial." (REXH V at 19). The direct appeal harmlessness ruling therefore cannot substitute for the Strickland prejudice inquiry.

Measured against the trial record and the totality of the evidence, Petitioner submits that the state court's no prejudice ruling was an unreasonable application of Strickland.

## F. Conclusion

Ground Two doesn't ask for any rule which deems every missed evidentiary objection as ineffective assistance. It asks the Court to evaluate what happened here: counsel recognized a serious legal problem; objected, said he would address it and instead, left the accusation before the jury without exclusion or limitation. It is those facts, not speculation about counsel's subjective intent, which define the Strickland inquiry. Petitioner submits that the state court's conclusion that this handling was objectively reasonable cannot be reconciled with that affirmative record under §2254(d).

For those reasons, Petitioner contends Ground Two satisfies §2254(d)(1) under Strickland and, to the extent the operative adjudication rested on an unreasonable factual determination actually made on the trial record, §2254(d)(2).

Ground Three addresses how the prejudice consequences of any independently established deficiencies should be assessed against the same totality of evidence.

## GROUND THREE

**Strickland's Totality-Of-The-Evidence Framework Governs The Prejudice Analysis If More Than One Strickland Performance Deficiency Is Independently Established In The Same Representation.**

### A. Governing Supreme Court Standard

Ground Three isn't a freestanding cumulative error claim. It addresses Strickland prejudice only if the Court first independently finds more than one preserved act or omission to constitute deficient performance under Strickland and those deficiencies bear on the same trial result. The discussion principally focuses on prospective juror Mauline F. and Detective Tedesco's testimony because those theories are developed at length in this Reply. Additional ineffective assistance subclaims pleaded in Ground One remain submitted as pleaded; within Ground Three, the plea communications and related §440 record also serve as evidentiary context unless an additional preserved deficiency is independently established.

Strickland measures prejudice against "the totality of the evidence before the judge or jury." 466 U.S. 668, 695-96 (1984). Ground Three doesn't convert that language into a freestanding cumulative error rule. Its logic is conditional: if more than one preserved act or omission is independently found constitutionally deficient and each bears on the same trial result, Petitioner contends the prejudice inquiry should evaluate those established deficiencies against the same totality of evidence rather than assume that each occurred in isolation.

Accordingly, Ground Three doesn't infer cumulative prejudice from the number of allegations. It asks the Court, after independently identifying any deficiencies actually established under Grounds One and Two or any other preserved deficiency separately established on the record, to asses the prejudice consequences of those established deficiencies under Strickland's reasonable probability standard. Contextual matters that aren't independently established as deficient aren't themselves added to the constitutional error side of the ledger. Petitioner doesn't

invoke a freestanding constitutional rule requiring reversal whenever multiple trial errors exist.

Ground Three rests on Strickland's prejudice framework, not on an independent cumulative error doctrine. To the extent multiple deficiencies are established, Petitioner contends the state court couldn't complete the Strickland prejudice inquiry by considering the effect of each as though the others hadn't occurred.

B. The State Court's Application of Strickland

The ineffective assistance allegations arise at different stages of the same trial, but Ground Three addresses one constitutional question: Strickland prejudice. Justice Lieb expressly considered the cumulative impact of any errors, and the First Department later stated that counsel's alleged deficiencies, "viewed individually or collectivelly," didn't deprive Petitioner of a fair trial or affect the outcome. People v. Campbell, 232 A.D.3d 479, 480 (1st Dept. 2024). Ground Three therefore doesn't rest on an assertion that the state courts failed to invoke collective consideration. Its narrower contention is that, if this Court independently finds more than one deficiency, the state courts' collective no prejudice result was itself an unreasonable application of Strickland when tested against the interaction of those established deficiencies on the same trial record.

That distinction matters under AEDPA. The Supreme Court has not clearly established a freestanding cumulative error doctrine aggregating unrelated constitutional violations, and Ground Three invokes no such rule. Petitioner relies instead on Strickland's own direction to measure prejudice against "the totality of the evidence before the judge or jury." 466 U.S. 695-96. The argument therefore depends on established Strickland deficiencies within the same representation; it doesn't aggregate non-errors into constitutional error. Additionally, Ground Three doesn't depend on extending Strickland beyond its own prejudice framework. It asks only that, if multiple deficiencies in the same trial representation are independently established, their effect on the same verdict be evaluated against the totality of the evidence rather than be treated as though each occurred alone.

Persuasive New York decisions illustrate the same application of Strickland. In People v. Miller, 11 A.D.3d 729, 730 (3d Dept. 2004), the court considered failures to request separate Huntley and Sandoval hearing together; in People v. Ugweches, 116 A.D.3d 440, 441-42 (1st Dept. 2014), it considered failures to object and to impeach together. These decisions aren't controlling under §2254(d)(1); they illustrate that Ground Three applies, rather than expands, Strickland's totality command. See also, People v. Oathout, 21 N.Y.3d 127, 132 (2013)(state law context recognizing cumulative prejudice where counsel's conduct reflects unfamiliarity with or disregard for basic criminal procedure and evidence).

The totality inquiry matters because the Betsy V. related case wasn't supported by an independent wall of physical evidence. No physical or forensic evidence connected Petitioner to a sexual offense against Betsy V. Walsh, a participating co-defendant who resolved his own exposure through a plea and cooperation agreement, was the only witness who described Petitioner's alleged conduct toward her. Any established deficiencies therefore have to be measured against a case which depended heavily on one interested witness.

The Clarice J. evidence doesn't change that point. Counts 1 and 2 arose from a separate incident weeks earlier involving a different complainant and different proof. Thus, whatever strength that evidence had for the Clarice J. charges, it didn't supply evidentiary weight for the Betsy V. counts. See, Wood v. Ercole, 644 F.3d 83, 99-101 (2d Cir. 2011); Perkins v. Herbert, 596 F.3d 161, 176-77 (2d Cir. 2010).

Therefore, Ground Three keeps its focus narrow. Mauline F. and Detective Tedesco are the principle ineffective assistance theories developed at length in this Reply. The remaining ineffective assistance subclaims pleaded in Ground One of the Petition remain submitted as pleaded unless expressly withdrawn. The Walsh letters and plea communication record also bear on Strickland's totality inquiry and on the reliability of counsel's retrospective strategic explanations; their use

for those additional purposes doesn't relinquish the underlying pleaded subclaims.

The Walsh letters illustrate why that context matters. Counsel said he didn't use them because he couldn't read the handwriting. Yet, at the §440 hearing he read the same letters aloud when asked, and Petitioner's father had prepared a typewritten version years earlier. Counsel then suggested the letters might make it look as though Petitioner was bribing Walsh but, the record reflects the opposite direction of the request: Walsh was soliciting money. Counsel ultimately acknowledged that the letters describing police pressure on Walsh had evidentiary value. (Hearing at 94, 102-108).

Counsel's testimony about that subject also shifted. He first said Walsh "never said anything about a hammer, or the police mistreated him," implying the matter had been explored. Asked directly moments later, counsel acknowledged that he hadn't questioned Walsh about the mistreatment. That inconsistency matters because a line of impeachment cannot fairly be described as an informed strategic rejection if counsel's own testimony shows he never pursued it. (Hearing at 102-110).

The trial record shows why the Walsh letters remain relevant. Because on cross-examination, counsel returned to the District Attorney statement then under discussion and asked Walsh whether it was accurate. Walsh answered, "Majority of it isn't." (Trial at 925). He then denied the particular statements attributed to him concerning the apartment. The letters could have supplied contemporaneous written context for the police pressure, which Walsh's trial admission left unexplained. The Walsh letters ineffective assistance subclaim remains submitted as pleaded in Ground One of the petition. Ground Three doesn't assume that competent counsel was constitutionally required to use the documents; it considers the letters in the totality analysis only if the Court first determines that the underlying omission constitutes deficient performance under the governing AEDPA and Strickland standards. Independently, the letters bear on the strength of the impeachment

actually presented and on the reliability of later strategic explanations concerning the same representation.

Counsel's successive explanations for not using the Walsh letters were undermined by the record, and his testimony was internally inconsistent on the basic point of his questioning of Walsh about the coercion claims. Eze v. Senkowski, 321 F.3d 110, 125 (2d Cir. 2003), describes comparable unexplained conduct as "oversight, carelessness, ineptitude, or laziness" rather than strategy. The Walsh letters ineffective assistance subclaim therefore remains submitted on its own pleaded terms; in this section, the same record also bears on the overall representation and on the reliability of counsel's strategic explanations.

In affirming the denial of Petitioner's CPL §440.10 motion, the Appellate Division characterized counsel's handling of the Angela V. letter and the Walsh letters together as reflecting "a reasonable and legitimate strategic basis for his decision to use only certain letters written by or to a codefendant, in order to impeach the People's witnesses." People v. Campbell, 232 A.D.3d 479, 480 (1st Dept. 2024)(citing People v. Wragg, 26 N.Y.3d 403, 412 (2015); People v. Pennington, 27 A.D.3d 269, 270 (1st Dept. 2006)). That characterization treats the two decisions as a single coherent editorial choice. However, the §440 hearing record complicates that characterization: the hearing court stated that "the decision to introduce the letter from Angela into evidence, while strategic, was flawed," while counsel's successive explanations for using the Walsh letters were each challenged by contrary record facts. (REXH Z at 28). Those circumstances don't logically establish a new Strickland violation by themselves, nor do they prove that any reasonable strategy was possible. They do, however, require the two decisions to be examined on their own record supported rationales rather that treating the label "strategy" as self-proving. Their reliance here remains limited to Strickland's totality analysis if multiple deficiencies are independently established.

The plea communications ineffective assistance subclaim remains submitted as pleaded in Ground One of the Petition. Its discussion in this section serves an additional and narrower evidentiary function: discrepancies in counsel's account bear on the weight of his separate, uncorroborated strategic explanations for Mauline F. and the Angela V. letter. Nothing in this discussion treats one alleged deficiency as automatic proof of another.

Frye confirms counsel's constitutional duty to communicate formal plea offers. Missouri v. Frye, 566 U.S. 134, 145 (2012); See also, Lafler v. Cooper, 566 U.S. 156 (2012). Those decisions supply the governing Supreme Court framework for the pleaded plea communications theory. This section doesn't ask the Court to infer deficient performance from every plea sheet notation or discrepancy in counsel's recollection. The plea record also serves a separate evidentiary function here by bearing on the reliability of counsel's account within Strickland's totality analysis.

The contemporaneous record developed at the §440 hearing includes plea sheets, maintained by the District Attorney's Office as part of its own files, reflecting that it was trial counsel, not Petitioner, who was recorded as insisting upon a misdemeanor disposition notwithstanding an outstanding felony offer. (Hearing at 4 and 115 Lns 23-24). Trial counsel's hearing testimony described an indeterminate sentence of five to ten years with five years probation supervised, which he said matched the disposition given to co-defendant Ebron; Petitioner contends that description didn't match the sentencing structure applicable to him as a first felony offender. (See, Hearing at 90 Lns 18-25 - 91 Lns 1-8; REXH Z at 33). The record also includes trial counsel's statement at sentencing, made years before the §440 hearing, where he stated "...There were no deals to be made. There was no lesser plea, like these other people copped out to. The only option we had was trial." (Sentencing at 8). The status sheets introduced at the §440 hearing reflect a more granular history than counsel's account: a C-felony offer with eight years and waiver of right to appeal on April 24, 2009; a felony offer with an

appeal waiver on July 8, 2009; and a September 30, 2009 notation reflecting proposed dispositions of three and five years for Petitioner and Ebron, respectively.

Neither predecessor counsel nor the prosecutor testified at the §440 hearing to resolve what was actually communicated. Those discrepancies don't themselves establish the pleaded plea communications claim; within Ground Three they also bear on credibility and the reliability of counsel's retrospective account.

The record Petitioner has cited also reflects a separate discrepancy concerning the length of counsel's own representation. Counsel testified at the §440 hearing that he was retained "a month or two before trial." (Hearing at 89 Lns 10-15). However, the District Attorney's own status sheets reflect counsel having replaced predecessor counsel of record by October 2009, which is more than a year before Petitioner's October 2010 trial. The same status sheets reflect a further and separate proposed dispostion, an offer of three and five years, respectively, dated September 30, 2009, which is distinct from the eight-year offer discussed above. These discrepancies aren't offered as an independent ground in their own right. They are offered as further, record based, context bearing on the same overall reliability of counsel's account that this totality inquiry requires this Court to consider.

The §440 court's own reasoning in crediting counsel over Petitioner on this point warrants the same scrutiny. Because, the court fount it "inconceivable" that counsel would've failed to convey a plea offer given his awareness of the obligation to do so. (REXH Z at 33). Respectfully, this a conclusion which rests on the court's own difficulty imagining the failure, not on evidence that the obligation was, in fact, met. Similarly, the court discounted the corroborating testimony of Petitioner's step-father on the theory that some unwitnessed meetings between Petitioner and counsel may have occurred, without identifying any evidence that a plea offer was discussed during one of them.

Respondent's own brief compounds the same difficulty. In substance, Respondent faults Petitioner for not calling attorney Ferris at the hearing, and treats that omission as sufficient to defeat Petitioner's contention that he was unaware of any plea offers. However, that argument doesn't account for the testimony of Petitioner's step-father's hearing testimony that attorney Ferris told him "the District Attorney has to offer me a plea, and then I have to tell you." (Hearing at 25 Lns 24-25 - 26 Lns 1-10). Respondent's position therefore doesn't reckon with the corroborating evidence already present in the hearing record. Whatever weight that evidence ultimately deserves, the absence of Ferris' testimony doesn't by itself answer the evidence Petitioner actually presented.

The plea record therefore serves two distinct functions. The pleaded plea communications ineffective assistance subclaim remains submitted on its own terms, while documented inconsistencies in counsel's account also may bear on the weight of his separate, uncorroborated explanations for retaining Mauline F. and introducing the Angela V. letter. The latter evidentiary use doesn't substitute for the independent Strickland showing required on any pleaded claim. Because the state courts expressly considered the alleged deficiencies collectively, Ground Three doesn't depend on the fact that Mauline F. and Detective Tedesco were discussed in separate claim sections. If this Court finds more than one preserved deficiency, the question is whether the state court's stated collective no prejudice result reasonably accounted for those established deficiencies operating together in the same trial before the same jury. That is why the record surrounding the Angela V. letter matter to the totality analysis. The Angela V. letter ineffective assistance subclaim remains submitted as pleaded in Ground One of the Petition; within Ground Three, the same record also bears on the prejudice analysis if multiple deficiencies are independently established.

Petitioner was the only defendant on trial. He faced charges involving Clarice J. and Betsy V., not Angela V. Yet, counsel introduced an unredacted letter in which Angela V. described being raped and forced to pose for photographs at

gunpoint, alongside references to the separate Clarice J. trafficking allegations. The prosecutor then used that material openly. In summation, he told the jury that Angel V. had "alleged that Ross Campbell held a shotgun to her privates," while also reminding the jury that Ross Campbell didn't rape Angela V.," and "Ross is accused of raping Betsy." (Trial at 1227-1229). The same uncharged shotgun allegation reached the jury through more than one route, including Detective Tedesco's relay of Angela V.'s lineup statement that Petitioner "was the guy that held the gun on me." (Trial at 1037). Angela later testified to this allegation as well, however, during cross-examination when asked if Petitioner did anything to you she indicated otherwise. (Trial at 997). Yet, the prosecutor twice called the letter "arguably the most important piece of evidence in this entire trial." (Trial at 1227-1228).

By the time of summations, the weapons count had been dismissed, so the Angela V. related shotgun allegation was no longer tied to a live weapons charge against Petitioner. (Trial at 1138 Lns 19-25 - 1139 Lns 1-10). Nor, was Petitioner charged with an offense against Angela V. Nevertheless, the material remained before the jury while it considered the separate Betsy V. related charges. No limiting instruction was given as to this material, in contrast to the specific instruction the court provided regarding evidence of uncharged marijuana dealing. No limiting instruction told the jury that the Angela V. material couldn't be used to infer Petitioner's propensity to commit the charged sexual offenses against Betsy V. (Trial at 1240). Therefore, the jury heard uncharged gunpoint conduct concerning Angela V. in addition to her allege rape; all alongside the charged Betsy V. allegations and without a judicial boundary on its use.

Counsel, by introducing the unredacted letter, placed that spillover risk into the case. See, People v. Weinstein, 42 N.Y.3d 439, 444-45, 457-59, 470-71 (2024) (uncharged sexual act evidence lacking a material nonpropensity purpose can produce substantial prejudice and interact with other trial errors). Petitioner doesn't invoke Weinstein as clearly established federal law or as an independent Molineux

ground; it is offered as New York law context for the danger this kind of unaddressed, uncharged material poses in a case already dependent on witness credibility. The prosecutor himself addressed the spillover danger. He told the jury he was "not asking [them] to say" that because "Daniel raped Angela and Petitioner was with him, Petitioner was therefore 'on the hook too.'" (Trial at 1228-1229). But, that was advocacy from the party using the evidence, not a limiting instruction from the court. The prosecutor then relied on Angela V.'s rape as part of what he called "the broader narrative of the case."

The record further reflects how the prosecutor characterized the circumstances surrounding trial counsel's introduction of the letter. In summation, the prosecutor argued that Angela "had no idea that she was going to be seeing this when she took the stand." (Trial at 1227 Lns 20-25). Thereafter, the prosecutor required Angela V. to read the letter in its entirety during redirect examination, so that its content wasn't merely admitted as an exhibit, but delivered directly to the jury. At the §440 hearing, counsel likewise described the prosecution's proof of the charged Betsy V. rape count as weak, emphasizing the lack of physical evidence and the negative DNA results. Counsel added: "I can't believe he got convicted." (Hearing at 111).

Counsel's own testimony at the §440 hearing reveals an unresolved tension in this same strategic decision. Counsel testified that he moved for a judgment of acquittal because, in his view, the prosecution hadn't proved that Petitioner raped anyone. Yet, counsel also introduced an unredacted letter describing Angela V.'s alleged rape by Ebron and accusing Petitioner of holding a shotgun to her. The letter didn't accuse Petitioner of raping Angela V., and Petitioner doesn't suggest otherwise. However, the narrower point is that counsel voluntarily placed highly prejudicial, uncharged gunpoint conduct involving Petitioner before the same jury deciding the disputed Betsy V. rape count.

Respondent defends counsel's use of the letter as impeachment. But, that

intended use didn't confine the jury's use of the unredacted accusation. Because, if counsel's position was that the prosecution's proof of the charged rape was weak, the uncharged shotgun allegation embedded in Angela V.'s rape narrative required some means of protecting against spillover, such as redaction or a limiting instruction. However, neither occurred.

Therefore, the Strickland concern is concrete: counsel placed an uncharged gunpoint allegation involving Petitioner during another complainants alleged rape before the jury without redaction or limiting instruction while simultaneously arguing that the charged rape evidence against Petitioner was inadequate. The record identifies the impeachment purpose Respondent relies upon, but it doesn't show how counsel protected against the foreseeable spillover risk created by admitting the accusation unreadacted.

Interestingly, the same question was independently raised by a sitting judge of the New York Court of Appeals at oral argument on September 12, 2017, before the §440 record, now before this Court, had been developed. Judge Feinman asked Respondent's counsel directly: "Why isn't the defense lawyer either seeking to have that redacted or....thinking twice about opening the door the way that he did?" (COA Oral Argument at 20). The exchange is cited only as confirmation that the absence of any redaction was independently apparent on the direct appeal record, not as legal authority.

Detective Tedesco's testimony created a related risk on the Betsy V. side of the case. Because, the formal charging architecture kept the two complainants separate: Count 3 charged Ebron alone with first degree rape of Angela V., while Counts 4, 5, and 6 charged Petitioner, Ebron, and Walsh acting in concert with offenses against Betsy V. (REXH A at Counts 3-6). Petitioner wasn't charged with raping Angela V., either as principal or as an accomplice. Yet, the jury heard uncharged sexual assault material concerning Angela V. and a testimonial accusation concerning Betsy V., and during deliberations asked, as to the rape and criminal

sexual act counts, "Is this in relation to Betsy and Angela?" The court answered that those counts concerned Betsy V. only. (Trial at 1261-1264). Petitioner relies on the note for its objective significance: a complainant/count boundary that was clear in the charging instrument nevertheless required clarification after the jury heard the two narrative together.

The trial record confirms that this risk was foreseeable and specifically identified before summations began. Because, at the charge conference, trial counsel sought and received the trial court's express confirmation that the rape count concerned Betsy V. alone and had nothing to do with Angela V., and counsel stated his intention to make that distinction clear to the jury. (Trial at 1151-1153). However, in his summation, trial counsel didn't deliver that clarification. Instead, he argued generally that no forensic evidence tied Petitioner "into any kind of sexual activity with either Betsy or Angela," addressing the two complainants together rather than drawing the very distinction he had obtained the court's permission to draw; especially since Petitioner wasn't on trial for any charge against Angela V. (Trial at 1178-1179). Petitioner doesn't ask this Court to find that counsel was constitutionally required to use any particular phrasing in summation. Petitioner submits only that the record shows the risk of exactly the confusion later reflected in the jury's notes was identified in advance, and that counsel's own summation didn't resolve it, but instead exacerbated it.

The evidentiary structure supporting the charged offenses concerning Betsy V. independently illustrates why Angela V. letter and Detective Tedesco's testimony mattered to the prejudice analysis. The witness who placed a shotgun in Petitioner's hands and testified that Petitioner directed him to hold Betsy V. at gunpoint was Walsh, a codefendant who pled guilty to unlawfully imprisoning Betsy V. in exchange for his testimony. Walsh admitted to holding the gun on Betsy V. and later having sex with her, while expressly characterizing his own encounter as consensual.(Trial at 931-933 ).Trial counsel also elicited, on cross-examination of Angela V., her confirmation that Petitioner never raped her (Trial at 997), and

argued that no forensic evidence, no DNA and no physical evidence connected Petitioner to a sexual offense against Betsy V. or Angela V. (Trial at 1151-1153).

Under New York law, a defendant may not be convicted upon the testimony of an accomplice unless that testimony is supported by corroborative evidence tending to connect the defendant with the commission of the crime. The final charge expressly told the jury that Crystal Aliaga, Lissette Bonaventre, and Walsh were accomplices because there was evidence that each participated in the conduct involved in the allegations, and then gave corroboration instruction. (Trial at 1239-1240). The instruction didn't establish that each participated in every charged offense. But, its significance here is narrower: testimony from several participating witnesses may overlap and may bear on credibility but, the number of accomplice sources isn't itself the same thing as an independent body of non-accomplice corroboration connecting Petitioner to a particular Betsy V. offense. Angela V.'s testimony that she heard Betsy V. "screaming and crying" through a wall, without more, establishes only that something occurred in the room; it doesn't identify Petitioner as the person committing a charged sexual act, and Lissette Bonaventre materially contested that distress detail. Accordingly, Walsh remains the witness who described Petitioner's alleged sexual conduct toward Betsy V. and the alleged gunpoint coercion tied to the charged Betsy V. related sexual offenses. Trial counsel's §440 testimony reflects the same assessment. When asked about the evidentiary value of the Walsh letter, counsel volunteered, unprompted, that Walsh was "the one who raped Betsy not Mr. Campbell," and repeated that Walsh "walked out the court for raping Betsy V." (Hearing at 106). Whatever weight the Court affords counsel's continuing assessment, it is offered only as further context for the strength of the properly admitted Campbell specific proof, not as an independent basis for relief or as a freestanding CPL §60.22 claim.

The prosecutor's own explanation for why the Angela V. letter mattered so much confirms the evidentiary chain. Introducing letter's account of the shotgun against Angela V., the prosecutor told the jury: "This is arguably the most important piece of evidence in this case because this is how you know Angela is telling the truth." (Trial at 1228-1229). The stated purpose wasn't to prove anything about the Betsy V. charges directly; it was to strengthen Angela V.'s general credibility as a witness, including her separate testimony that she heard Betsy V. "screaming and crying." Respondent's post-hearing submission later invoked that distress observation as corroboration for Walsh's account of the Betsy V. charges, while Lissette Bonaventre materially contested it, as discussed below. (REXH X at 22 and REXH Z at 27-30). The mechanism is therefore indirect: the letter bolstered Angela V.'s general credibility; the bolstering could strengthen the distress observation; and the distress observation, in turn, was used as corroboration of Walsh's Betsy V. specific account. The letter didn't itself prove or directly corroborate the alleged sexual acts against Betsy V.

Again, Respondent's own post-hearing submission before the §440 court confirms this point. While opposing Petitioner's claim regarding the Angela V. letter, Respondent conceded that "neither Angela's testimony, nor her letter, proved that [Petitioner] raped Betsy V." (REXH X at 22). That was the charged rape offense at issue. Respondent further stated that, because Angela V. "was not in the room when Betsy was raped," the value of her testimony was "limited only to her corroboration that she heard Betsy 'screaming and crying' in the bedroom," such that "Angela's testimony was not pivotal in proving [Petitioner's] guilt." (REXH X at 22). Respondent then identified the proof supporting the rape conviction as being Walsh's testimony, "corroborated by Angela's observations of Betsy 'screaming and crying' in the bedroom afterwards." (REXH X at 22). However, that corroborated detail was materially contested by another prosecution witness who was present in the apartment. Lissette Bonaventre, testified that when Betsy V. emerged she "came out of the room fairly normal" and went to comfort Angela, who was "still

crying." (Trial at 676-677). On cross-examination, Lissette Bonaventre testified that the apartment "was quiet," that she didn't see Betsy V. crying, and that Betsy V. didn't say that she'd been raped. (Trial at 714). That affirmative contrary testimony bears directly on the strength of Respondent's identified corroboration and therefore on the prejudice inquiry.

The same submission emphasizes the letter's strategic importance when defending counsel's decision to introduce it. Respondent argued that the letter gave counsel "a more convincing argument" that Walsh had a motive to lie, an argument Respondent says counsel "would not have been able to make" without it. Elsewhere, Respondent minimizes the prejudice created by the unredacted accusations. Strickland requires the court to asses the actual consequences of that choice, including the unaddressed spillover risk created by the same material Respondent describes as strategically important.

The §440 court's own decision reflects the same difficulty independently. In finding no prejudice from the Angela V. letter, the court reasoned that the shotgun allegation's "prejudice was minimized" because Angela's claim "was corroborated both by the photos of her naked body found on the cell phone...and the shotgun shells found in the apartment." (REXH Z at 29). However, neither the photographs, which Ebron took, nor the shells, which establish only that a shotgun existed somewhere in the apartment, corroborate the specific, disputed fact that Petitioner held it.

New York's own courts have applied precisely this principle in rejecting general corroborating evidence that doesn't connect to the specific fact actually in dispute. See, People v. Carroll, 95 N.Y.2d 375, 384-85 (2000)(physical evidence consistent with penetration having occurred at some point did not corroborate the specific charged incident, because it was "not consistent with the facts and circumstances surrounding the alleged rape," and therefore "did not provide any proof of penetration"). The court further found that Angela V. "was only able to

testify that she heard Betsy crying and screaming" the same detail Lissette Bonaventre's testimony, discussed above, materially contests. The decision under review accordingly rests on the same non-corroborating "corroboration" Respondent's own later submission relies upon. (REXH Z at 29-30).

Lissette Bonaventre's testimony left another evidentiary gap. Although she testified that Petitioner and Ebron took Betsy V. into the backroom. (Trial at 676), she recalled seeing only Ebron emerge from it, and didn't see or recall Petitioner or Walsh doing so. (Trial at 677). Her testimony accordingly places Petitioner entering the room but, doesn't independently corroborate what occurred inside it or confirm when, or whether, he left.

That evidentiary setting also supplies the denominator for the preserved element specific omitted motion claim. New York law required proof of penetration, however slight, to establish the completed first degree rape offense. See, People v. Carroll, 95 N.Y.2d 375, 383-85 (2000). Carroll held the penetration proof insufficient where neither the testimony nor the physical evidence established that element. Walsh's account here used generalized descriptions that Petitioner started like having sex with her, rather than expressly describing penetration. (Trial at 904). The point isn't that Carroll itself supplies a federal basis for habeas relief or that Petitioner renews a freestanding claim under Jackson v. Virginia, 443 U.S. 307. Carroll supplies the governing New York law benchmark against which the strength of counsel's omitted element specific motion must be assessed. See, Ponnapula v. Spitzer, 297 F.3d 172, 182 (2d Cir. 2002)(recognizing that the elements of a state offense are defined by state law). Whether the trial record nevertheless established the required element through the prosecutions principal or accessorial theory is the merits question a focused dismissal motion would have required the trial court to decide. Under Strickland and Kimmelman, the strength of that omitted motion bears on performance and prejudice; the same evidentiary limitations also bear on the strength of the untainted proof under Brecht.

The contemporaneous record sharpens the pleaded Strickland claims concerning counsel's failure to present element specific dismissal arguments. Counsel did make a general motion to dismiss all charges because the People hadn't proved every element. (Trial at 1138). But when the court identified first degree rape as a remaining count, counsel responded, "I think rape was already thrown out before." The prosecutor corrected him, confirmed that Counts 1, 2, 4, 5, and 6 remained, and the court reserved decision. (Trial at 1139-1140). That exchange doesn't establish counsel's subjective reason for omitting an element specific motion. It does, however, supply affirmative contemporaneous evidence bearing on whether the omission reflected informed professional judgment: at the very moment the dismissal issues was before the court, counsel stated that he believed the rape count was no longer in the case. Hinton v. Alabama, 571 U.S. 263, 274 (2014), confirms that Strickland deference doesn't transform an omission caused by a mistaken understanding into a strategic choice merely because counsel otherwise acted deliberately.

The charge conference reinforces the point and the weakness of the proof against which prejudice must be measured. The court identified Penal Law §§130.35(1) and 130.50(1), and counsel confirmed that the rape count concerned Betsy V. only. (Trial at 1148-1151). Counsel then emphasized the absence of rape kit evidence. After counsel maintained that the missing rape kit should count against the People, the court stated that the jury could use common sense and experience to conclude, "gee, maybe it wasn't a rape," and added, "there is no rape kit or anything else like that." (Trial at 1152-1153). The exchange confirms the evidentiary weakness was part of the contemporaneous trial record and therefore bears on Strickland prejudice and on Respondent's later characterization of the proof is overwhelming.

New York law also explains why counsel's generic dismissal motion didn't substitute for a specifically directed challenge. See, People v. Gray, 86 N.Y.2d 10, 19-21 (1995). Counts 4 and 5 charged Petitioner acting in concert, and the

Bill of Particulars stated that the People intended to prove him as "A principle and accomplice." (Bill of Particulars at 2). But an acting in concert allegation didn't relieve the People of proving conduct constituting each charged offense. As to Count 4, Walsh expressly denied forcing his own intercourse with Betsy V. and characterized that encounter voluntary, while separately admitting the gunpoint restraint. (Trial at 931-933). Respondent's original §440 opposition defended the penetration issue by arguing that the jury could infer intercourse from Walsh's description of Petitioner's alleged conduct. (REXH T at 37-39).As to Count 5, Respondent separately invoked Walsh's wording and the acting in concert charge in answering the preserved subclaim. (REXH T at 39-40). At the moment count specific dismissal was before the trial court, however, counsel said he believed the rape count had already been thrown out and never presented the focused motions that would have required adjudication of the disputed elements. (Trial at 1139-1140). That contemporaneous misunderstanding bears directly on whether the omissions reflected informed professional judgment and on the reasonable probability that proper litigation of the preserved motions would have affected the result.

That contention doesn't convert Ground One into a newly pleaded freestanding claim under Jackson v. Virginia, 443 U.S. 307 (1979). Kimmleman v. Morrison, 477 U.S. 365, 374-75, 380-85 (1986), confirms that a Sixth Amendment ineffective assistance claim remains distinct from the underlying legal issue counsel failed to litigate, even though the merits and likely effect of the omitted motion remain necessary to the Strickland showing. Hinton v. Alabama, 571 U.S. 263 likewise treats counsel's mistaken understanding, rather than a reasoned strategic choice, as constitutionally relevant to the performance inquiry. And, although it doesn't supply clearly established law for purposes of §2254(d)(1), Cornell v. Kirkpatrick, 665 F.3d 369, 379-84 (2d Cir. 2011), is a close persuasive analogue because the Second Circuit granted §2254 relief where a count specific, potentially dispositive omission arose from oversight rather than strategy. Here, the relevant denominator is the focused motion counsel actually failed to make, the trial record on which

that motion would have been decided, and Respondent's actual answer to the preserved subclaim. Those same element specific questions and evidentiary limitations also bear on Strickland prejudice and, in Ground Four, the strength of the untainted record under Brecht.

The preserved kidnapping subclaim requires the same record specific discipline. The Bill of Particulars placed the June rape, criminal sexual act, kidnapping, and weapons charges inside 1551 Bruckner Blvd. (Bill of Particulars at 4). In summation, the prosecutor expressly told the jury that kidnapping didn't require proof that Angela and Betsy had been "snatched off the street" or dragged to the car "I'm not trying to prove that to you" and identified "Betsy being held at gunpoint at 1551 Bruckner" as "the restraint that I'm talking about." (Trial at 1229-1230). Walsh had described the shotgun being held on Betsy V. so that she would comply during the alleged sexual conduct. (Trial at 904-905). The merger issue preserved in the §440 motion was therefore not an abstract disagreement about the entire evening. It asked whether the apartment restraint the prosecutor himself identified as the kidnapping had independent criminal significance apart from the sexual offenses or was so integral to their commission that separate kidnapping liability couldn't fairly be attributed to it. See, People v. Cassidy, 40 N.Y.2d 763, 767 (1976); People v. Smith, 47 N.Y.2d 83, 87 (1979); People v. Gonzalez, 80 N.Y.2d 146, 152-53 (1992). Each of those authorities predated Petitioner's October 2010 trial.

That theory also traveled through the state appellate process. The perfected First Department brief argued that the initial entry into the car was voluntary and that the alleged restriction began later when Angela V. and Betsy V. were held at gunpoint for the photographing and sexual conduct. (REXH HH at 52-53). In its original §440 opposition, the People later invoked evidence of a "street abduction through the stipulation of Sergeant John Stubbing," while acknowledging that the trial prosecutor "declined to rely on that testimony" in summation; the People also

argued that Betsy V. remained restrained throughout the time at 1551 Bruckner because the shotgun remained available. (REXH T at 40-41). Those later collateral explanations don't erase the narrower restraint theory the prosecutor actually selected for the jury. The Strickland inquiry therefore asks whether competent counsel should have litigated the preserved merger argument against the prosecution's particularized trial theory and whether omission of that argument created a reasonable probability of a different result.

Legal sufficiency doesn't resolve the distinct Strickland prejudice inquiry. The challenged material entered a case whose direct proof against Petitioner on the Betsy V. incident depended heavily on a cooperating accomplice. Petitioner also testified in his own defense. He denied having physical or sexual relations with either woman, denied forcing them to do anything, and denied seeing anyone else force them, explaining that he had been sleeping. (Trial at 1089-1090). That testimony was before the jury and forms part of the same trial record against which the prejudice consequences of any independently established Strickland performance deficiencies must be assessed.

If the Court finds more than one deficiency in counsel's performance under Strickland, the prejudice consequences of those deficiencies must be assessed against that same trial record. The jury's question "Is this in relation to Betsy and Angela?" objectively show that complainant attribution remained a live subject of clarification at the end of the trial.

Likewise, the Appellate Division's harmless-error ruling doesn't displace Strickland's distinct prejudice analysis. The state court itself recognized, when ordering the evidentiary hearing, that harmless-error analysis doesn't control an ineffective assistance claim. The same distinction applies when Strickland prejudice is assessed across multiple deficiencies in the same representation. Where independently established deficiencies affected the same jury, the prejudice question concerns their effect on confidence in that single verdict, not

hypothetical separate trials in which each deficiency is artificially isolated from the others. That application follows Strickland's own totality command and doesn't depend on a freestanding cumulative error doctrine.

C. Conclusion

Ground Three applies no new constitutional rule. If the Court independently sustains more than one deficiency in counsel's performance under Strickland affecting the same verdict, the prejudice inquiry should assess the combined consequences of those established deficiencies against the same totality of evidence. Ground Three neither aggregates non-errors nor supplies a separate §2254(d)(1) basis for relief.

Ground Four addresses Petitioner's independent claim that the admission of testimonial accusation evidence from a non-testifying complaint violated Crawford v. Washington, and that the state court's harmless-error determination doesn't withstand review under the governing standards applicable to federal habeas proceedings. Ground Two supplies a direct Strickland basis for relief if its requirements are satisfied. It also supplies cause to reach Ground Four only to the extent the constitutional deficiency sustained under Ground Two includes the act or omission that produced the Confrontation Clause preservation default.

## GROUND FOUR

The Admission Of A Testimonial Accusation From A Non-Testifying Complainant Violated The Confrontation Clause, And Petitioner Contends That The State Court's Harmless-Error Adjudication Does Not Withstand Review Under 28 U.S.C. §2254(d) Or The Governing Habeas Standards.

### A. The State Court's Harmless-Error Adjudication

Unlike the ineffective assistance claims presented in the proceeding Grounds, Ground Four concerns an independent constitutional claim arising under the Confrontation Clause of the Sixth Amendment.

Ground Four didn't first appear years later in collateral litigation. In fact, at Sentencing, before any appeal, Petietitioner told the court that as to Betsy V. he had never had the right to cross-examine the person whose accusation had been used against him (Sentencing at 12). The statement isn't offered as legal authority; it shows that the Confrontation problem was apparent from the outset. And, the Sentencing Court recognized the same basic fact stating "We hadn't heard from this such woman...it's true we have not heard from her," and that, "her whereabouts seemed to be unknown.." (Sentencing at 15). Again, that observation doesn't decide the claim. Instead, it confirms that Betsy V.'s absence and the resulting lack of confrontation wasn't a theory invented after the verdict.

The Appellate Division itself acknowledged that "a reference to an identification by a nontestifying victim should have been excluded." People v. Cambpell, 131 A.D.3d at 882. Ground Four focuses on the accusatory portion of Betsy V.'s statement "That's the one who told the fat kid to rape me," and on the constitutional and harmless-error consequences of allowing that accusation to reach the jury. Confrontation Clause violations are subject to harmless error review; Crawford doesn't make every violation automatically reversible. AEDPA therefore requires the Appellate Division's harmless error ruling to be tested against the trial record actually before it. That record includes both the content of the accusation and the objective signs of what remained in dispute during

deliberations. Some independent evidence doesn't end the inquiry. Because, the question is whether the state court reasonably applied harmless-error principles to this particular record.

B. Respondent's Procedural Default Defense is Overcome by Cause and Prejudice

The Appellate Division held the Confrontation Clause claim unpreserved under New York's contemporaneous objection rule, declined review as of right, and then held in the alternative that the error was harmless beyond a reasonable doubt. People v. Campbell, 131 A.D.3d 882, 882 (1st Dept. 2015)(citing, People v. Eastman, 85 N.Y.2d 265, 276-78 (1995)). Respondent relies on that preservation ruling in asserting procedural default here.

Assuming arguendo that Respondent's asserted procedural bar applies, Ground Four establishes cause and actual prejudice in response to that defense. See, Coleman v. Thompson, 501 U.S. 722, 729-30, 750 (1991); Murray v. Carrier, 477 U.S. 478, 485, 488-89 (1986). On that premise, the cause and prejudice showing set out below permits federal review of the constitutional claim. On Respondent's premise, federal review of Ground Four requires cause for the asserted default and actual prejudice, absent a fundamental miscarriage of justice. Coleman v. Thompson, 501 U.S. at 750; Murray v. Carrier, 477 U.S. 478, 485 (1986).

For cause, Petitioner relies on the exhausted trial counsel claim in Ground Two. Ineffective assistance can excuse a default only if the ineffective assistance claim is itself constitutionally sufficient and exhausted. Murray v. Carrier, 477 U.S. at 488-89; Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000). Ground Two supplies that theory because counsel recognized hearsay and Confrontation Clause problems when Detective Tedesco relayed Betsy V.'s accusation, yet the federal ground wasn't preserved and the accusation stayed before the jury. A ruling sustaining Ground Two establishes cause only to the extent the Court finds constitutionally deficient the act or omission that produced the preservation

default; a finding of deficient handling on some other, non-preservation theory wouldn't automatically establish cause. The same record facts supporting Strickland prejudice: the accusation remaining before the jury without exclusion or limitation, the jury notes on complainant attribution and lineup evidence, and the contested strength of the properly admitted Betsy V. proof also bear on the actual prejudice required to excuse the default and the substantial and injurious effect showing under Brecht.

This is a trial counsel cause theory, not an appellate counsel theory. The Ground Two claim was litigated at the §440 hearing and reviewed on the merits, satisfying Edward's exhaustion requirement for the claim used as cause. Therefore, cause depends on Ground Two satisfying Strickland as a constitutional claim, including both deficient performance and prejudice. A merely imperfect objection isn't enough. Petitioner contends Ground Two clears that threshold for the reasons already given.

Procedural default and Brecht harmlessness then remain separate. To excuse the default, Petitioner must show actual and substantial disadvantage from the constitutional error. Murray v. Carrier, 477 U.S. at 494. To obtain habeas relief, Brecht separately requires a substantial and injurious effect or influence on the verdict. 507 U.S. at 637. The same record can support both, but the standards aren't interchangeable.

Therefore, Ground Four identifies the exhausted constitutional claim offered as cause and turns next to the trial record bearing on actual prejudice, AEDPA harmless-error review, and Brecht.

C. Governing Supreme Court Standards

The Sixth Amendment guarantees an accused the right "to be confronted with the witnesses against him."

In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that testimonial statements made by a witness who doesn't appear at trial are inadmissible unless the witness is unavailable and the defendant previously had an opportunity for cross-examination. Crawford rejected admission of testimonial hearsay based solely on judicial assessments of reliability and reaffirmed confrontation as the constitutionally required procedure. Douglas v. Alabama, 380 U.S. 415, 419-20 (1965), likewise held that the Confrontation Clause was violated where an accomplice's incriminating statement was effectively placed before the jury while the defendant lacked an opportunity to cross-examine the accomplice about it. Crawford supplies the controlling testimonial statement framework here.

The testimonial premise is concrete: Betsy V.'s statement was made to law enforcement during a formal lineup conducted as part of the investigation and directly accused participants in the charged conduct. Petitioner therefore treats the statement as testimonial under Crawford. Both Crawford and Douglas predate the Appellate Division's 2015 adjudication; Crawford supplies the controlling testimonial statement rule, while Douglas reinforces the underlying right to cross-examine the declarant whose accusation reaches the jury. See, Greene v. Fisher, 565 U.S. 34, 38 (2011)(clearly established law is determined as of the date of the relevant state court decision). Hemphill v. New York, 595 U.S. 140, 149-52 (2022), post-dates the Appellate Division's 2015 adjudication and is cited only as later confirmation of Crawford's core confrontation principle, not as clearly established law at the time of that adjudication. Ryan v. Miller, 303 F.3d 231, 249-51 (2d Cir. 2002), likewise predates Crawford and is cited only as persuasive Circuit context concerning accusatory hearsay relayed through law enforcement testimony, not as an application of Crawford or as clearly established federal law.

A Confrontation Clause violation doesn't automatically require reversal. On direct review, Chapman v. California, 386 U.S. 18 (1967), requires the state to prove harmlessness beyond a reasonable doubt, the standard the Appellate Division applied here. On federal habeas review, Brecht v. Abrahamson, 507 U.S. 619 (1993)

supplies the ultimate harmless-error standard even when the state court applied Chapman. See, Fry v. Pliler, 551 U.S. 112, 121-22 (2007). The Appellate Division's Chapman ruling therefore remains relevant to §2254(d), while Brecht governs the ultimate federal harmlessness determination.

Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986), identifies the relevant Confrontation Clause harmlessness considerations: the importance and cumulative nature of the challenged testimony, corroborating or contradicting evidence on material points, and the overall strength of the prosecution's case. Applied to this record, those factors weigh against harmlessness. Orlando v. Nassau County District Attorney's Office, 915 F.3d 113 (2d Cir. 2019), provides a Second Circuit application rather than clearly established law: there the court granted §2254 relief where a detective relayed a non-testifying accomplice's facially inculpatory statement notwithstanding limiting instructions. Here, no limiting instruction confined Betsy V.'s accusation.

Brecht v. Abrahamson, 507 U.S. 619 (1993) requires Petitioner to show that the constitutional error had a substantial and injurious effect or influence in determining the jury's verdict. Under Brown v. Davenport, 596 U.S. 118, 134 (2022), a federal habeas petitioner must satisfy both AEDPA's requirements and the applicable federal harmless-error inquiry before relief may be granted.

Once the procedural default is excused through the independently required showings of cause and actual prejudice discussed above, Ground Four proceeds through three additional inquires: whether Detective Tedesco's testimony conveyed testimonial accusation evidence barred by Crawford; whether the Appellate Division's harmless-error adjudication survives §2254(d); and whether the constitutional error had the substantial and injurious effect or influence required by Brecht.

## D. The Contemporaneous Trial Record

The harmless-error inquiry returns to the trial itself. During the People's case, Detective Tedesco described a lineup involving Betsy V., who never testified. He recounted Betsy V.'s identification of codefendant Ebron and then relayed an additional statement attributed to her:

"That's the one who told the fat kid to rape me."

The jury therefore heard Betsy V.'s accusation even though she never appeared and Petitioner never had the opportunity to cross-examine her. (Trial at 1034).

The record didn't end there. Because once deliberations began, the jury sent out several notes about the sexual offense counts and the evidence supporting them. Most notably, the jury asked, "is this in relation Betsy and Angela?" as to the Rape and Criminal Sexual Act counts. The court answered that those counts concerned Betsy V. only. The jury also asked about the kidnapping count, requested lineup photographs involving Petitioner and Ebron, and sought further information about the evidence supporting the sexual offenses. (Trial at 1261-1264). Granted, those notes cannot tell the Court what any juror thought. However, they can show, objectively, the subjects on which the jury wanted clarification before reaching its verdict. And, those subjects overlap with the challenged statement: who was involved, which complainant supported which count, and what evidence tied the participants to the sexual offenses.

The harmless-error record therefore includes more than the bare existence of the accusation. It includes the jury's own contemporaneous requests for guidance on the same cluster of issues.

## E. The State Court's Harmless-Error Analysis Was Unreasonable

A Confrontation Clause violation can be harmless. Under AEDPA, the issue isn't whether this Court would conduct the Chapman analysis differently on direct review, nor whether the Appellate Division discussed every fact Petitioner considers

important. The issue is whether the harmless beyond a reasonable doubt result remains within the range of fairminded disagreement permitted by 28 U.S.C. §2254(d). See, Harrington v. Richter, 562 U.S. 86, 101 (2011). Under 28 U.S.C. §2254(d), the Appellate Division's harmless-error determination must be tested against that record.

Respondent relies on the Appellate Division's Chapman determination as the AEDPA barrier to Ground Four. Petitioner doesn't dispute that AEDPA and Brecht impose separate requirements on federal habeas review. See, Brown v. Davenport, 596 U.S. 118, 134 (2022). The dispute is whether the state court's Chapman determination itself survives review under §2254(d); if it doesn't, Petitioner must still separately satisfy Brecht. Petitioner's challenge concerns the reasonableness of the harmlessness result. The relevant record includes Betsy V.'s accusation, the jury's requests concerning count attribution and lineup evidence, and the contested strength of the properly admitted Betsy V. proof. The jury later asked whether the Rape and Criminal Sexual Act counts were "in relation to Betsy and Angela," and requested lineup photographs, and sought further guidance about the charged offenses. (Trial at 1261-1264). Petitioner relies on those requests for their objective significance: complainant attribution and lineup evidence were subjects on which the jury sought clarification, materially weakening the premise that the accusation was necessarily insignificant to the verdict.

For those reasons, Petitioner submits that the Appellate Division's harmless-error determination involved an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. §2254(d)(1). Any §2254(d)(2) theory limited to a specific factual determination actually made by the state court and shown unreasonable in light of the state court record; the principal harmless-error challenge proceeds under §2254(d)(1).

F. Prejudice Under Brecht

Brecht requires a further showing that the constitutional error had a substantial and injurious effect or influence on the verdict. The standard focuses on the error's influence, not on the bare legal sufficiency of the remaining evidence, and relief is appropriate when the reviewing court is left in grave doubt about that influence. Brecht v. Abrahamson, 507 U.S. 619 (1993). That standard is satisfied on this record.

Also, the accusation wasn't cumulative of testimony that had been tested in court. Detective Tedesco delivered Betsy V.'s words in her absence, and the defense had no opportunity to question her about them. Nor, was the challenged language merely an identification of Ebron. In the same sentence, Betsy V. attributed to Ebron an instruction directing "the fat kid" to rape her. The challenged testimony therefore conveyed substantive accusation evidence beyond Ebron's identification. Thus, because Betsy V. never testified, that accusation reached the jury without cross-examination of its source.

Those same jury requests remain relevant under Brecht for a different reason: they identify subjects touched by the accusation that remained active during deliberations. Without proving reliance, they contribute to the assessment of whether the accusation had a substantial and injurious influence on the verdict. (Trial at 1261-1262).

The strength of the properly admitted Betsy V. evidence also matters under Brecht. See, Wood v. Ercole, 644 F.3d 83, 99-101 (2d Cir. 2011)(emphasizing the strength of the untainted proof in harmless-error analysis). No physical or forensic evidence connected Petitioner to a sexual offense against Betsy V. Walsh, the cooperating codefendant, was the witness who described Petitioner's alleged sexual conduct toward Betsy V. and the alleged gunpoint coercion tied to the charged Betsy V. related sexual offenses. The final charge identified Crystal Aliaga, Lissette Bonaventre, and Walsh as accomplices. (Trial at 1239-1240).

Overlap among participating witnesses isn't automatically the equivalent of multiple independent non-accomplice sources connecting Petitioner to a particular Betsy V. offense. Respondent later identified Angela V.'s report that Betsy V. was "screaming and crying" as corroboration of Walsh. However, Lissette Bonaventre's testimony materially contested that detail: she testified that the apartment was quiet and that Betsy V. emerged "fairly normal." (REXH X at 22; Trial at 676-677). The shotgun shells established that a shotgun existed; they didn't, however, establish the specific conduct attributed to Petitioner. The constitutional error therefore entered a credibility driven case in which the strength and independence of the untainted proof remained disputed.

On that record, Petitioner submits there is at least grave doubt about the accusation's influence on the verdict. Under O'Neal v. McAninch, 513 U.S. 432 (1995), that doubt is resolved in the petitioner's favor. See also, Brinson v. Walker, 547 F.3d 387, 395-96 (2d Cir. 2008).

For these reasons, the Confrontation Clause violation had a substantial and injurious effect or influence on the verdict within the meaning of Brecht.

## G. Conclusion

Ground Four doesn't treat every Confrontation Clause violation as reversible. It asks the Court to consider this one in the record where it occurred: a non-testifying complainant's accusation was relayed through a detective, and the jury later sought clarification about the sexual offense counts, complainant attribution, and lineup evidence. The jury's requests are objective facts bearing on both AEDPA review of the state court's harmlessness ruling and the separate Brecht inquiry.

Petitioner therefore submits that the Appellate Division's harmless-error adjudication was an unreasonable application of clearly established Supreme Court law and that the Crawford error had a substantial and injurious effect or influence on the verdict under Brecht.

## CERTIFICATE OF APPEALABILITY

Should this Court deny the Petition, Petitioner respectfully requests that a Certificate of Appealability issue pursuant to 28 U.S.C. §2253(c).

A Certificate of Appealability should issue when reasonable jurists could debate the validity of a constitutional claim or conclude that the issues deserve encouragement to proceed further. See, Slack v. McDaniel, 529 U.S. 473, 484 (2000); Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003). This case presents constitutional questions that reasonable jurists could debate.

**First**, reasonable jurist could debate the state court's application of Strickland v. Washington, 477 U.S. 668 (1984), Wiggins v. Smith, 539 U.S. 510 (2003), and Rompilla v. Beard, 545 U.S. 374 (2005) to counsel's handling of prospective juror Mauline F., including both the reasonableness of the challenged professional judgment and the resulting Strickland prejudice determination, given Petitioner's contention that the voir dire record didn't contain the factual development necessary to support an informed strategic judgment, and, independently, the state court's decision to credit counsel's stated basis rested on record unsupported and professionally unreasonable assumptions concerning sexual assault disclosures. That reasonable jurists could so debate is illustrated by the oral argument before the New York Court of Appeals in this very case on September 12, 2017. Judge Rivera stated: "But that kind of begs the question, because she does say to defense counsel, yes, I'd rather talk to the judge in private, and that conversation never happens." (REXH S at Exhibit B at 15). And Judge Fahey separately asked: "All right. So what about the question of why the Court conducted no futher inquiry? Isn't that a dispositive question? There clearly seems to be something wrong. The Court conducted no inquiry at all." (REXH S at Exhibit B at 13). Petitioner doesn't cite that colloquy as legal authority; it is offered solely as illustrative confirmation that jurists of reason identified the omitted inquiry as a substantial issue warranting direct examination.

**Second**, reasonable jurists could debate the state court's application of Strickland v. Washington, 477 U.S. 668 (1984) to counsel's handling of Detective Tedesco's testimony concerning a testimonial accusation attributed to a non-testifying complainant, including whether the state court reasonably treated the affirmative sequence shown by the record as objectively reasonable professional assistance created the prejudice Strickland requires.

**Third**, if the Court independently finds multiple deficiencies in counsel's performance under Strickland, but denies the underlying ineffective assistance claims based on prejudice, reasonable jurists could debate whether Strickland's totality of the evidence framework required the prejudice consequences of those established deficiencies to be assessed together against the same trial record rather than as though each occurred in isolation.

**Fourth**, reasonable jurists could debate the preserved Ground One failure to move subclaims, including whether counsel's contemporaneous statement that he thought the Rape count had already been dismissed, considered with the trial record governing the element specific motions and the prosecution's apartment restraint theory on kidnapping, makes the state courts' Strickland rulings at least debatable under §2254(d).

**Fifth**, reasonable jurists could debate the Appellate Division's conclusion that admission of the testimonial accusation was harmless under the governing standards applicable to federal habeas review, including Crawford v. Washington, 541 U.S. 36 (2004), Chapman v. California, 386 U.S. 18 (1967), Brown v. Davenport, 596 U.S. 118 (2022), and Brecht v. Abrahamson, 507 U.S. 619 (1993). If this Court denies Ground Four on procedural default grounds, Slack requires debate both over the procedural ruling and the validity of the underlying constitutional claim. Petitioner submits both are debatable: reasonable jurists could disagree over whether the constitutionally sufficient portion of Ground Two supplies cause for the deafault, whether the trial record establishes the actual prejudice necessary

to excuse that default, and whether the underlying Crawford claim satisfies the separate AEDPA and Brecht requirements for habeas relief.

To the extent the Court reaches and denies any additional preserved Ground One subclaim, Petitioner likewise requests a Certificate of Appealability on any specific merits or procedural ruling that satisfies the Slack and Miller-El standard.

## CONCLUSION

This Reply doesn't ask the Court to retry Petitioner's Criminal case, reweigh the evidence presented to the jury, or substitute its judgment for that of the state courts. Nor does Petitioner contend that every challenged strategic decision, evidentiary ruling, or trial irregularity independently requires federal habeas relief. Section 2254(d) supplies the governing framework: each state court adjudication must be measured for an unreasonable application of clearly established Supreme Court law or, where applicable, an unreasonable determination of fact on the state court record.

The principal Ground One theory developed at length in this Reply identifies two independent bases for conducting that the state court's strategic deference analysis under Strickland was unreasonable: the incomplete factual foundation reflected in the contemporaneous voir dire record and counsel's stated rationale for discounting Mauline F.'s disclosure. That theory separately addresses the prejudice Strickland requires. The additional ineffective assistance subclaims pleaded in Ground One remain submitted as preserved in the Preliminary Statement. As to the element specific Rape, Criminal Sexual Act, and Kidnapping merger subclaims, the Reply frames the omitted motions against the contemporaneous (Trial at 1139-1140) misunderstanding, the trial record on which the motions would have been decided, Respondent's actual answers to those preserved subclaims, and the restraint theory the prosecutor actually presented to the jury.

Ground Two presents an independent Strickland claim arising from counsel's handling of the testimonial accusation attributed to Betsy V. If sustained under both Strickland prongs and §2254(d), it

supplies a direct basis for relief; to the extent the same constitutionally deficient act or omission produced the preservation default, it also supplies the cause component of Ground Four's procedural default analysis.

Ground Three doesn't create an independent cumulative error rule. It addresses only the prejudice analysis that applies if multiple deficiencies in counsel's performance are independently established under Strickland within the same representation and bear on the same trial result. In that circumstance, Petitioner contends their prejudice consequences should be evaluated against the same totality of evidence rather than by assuming that each occurred in isolation. Ground Three doesn't convert contextual concerns or conduct found reasonable into error.

Ground Four contends that the Appellate Division unreasonably concluded that admission of testimonial accusation evidence from a nontestifying complainant was harmless under the governing federal habeas standards. Its cause theory depends on Ground Two establishing constitutionally ineffective assistance under both Strickland prongs and, specifically, a constitutionally deficient act or omission that produced the preservation default. Procedural default prejudice and Brecht harmlessness are then addressed separately on the same trial record.

Respectfully, Petitioner submits that, when each adjudication is measured against the contemporaneous record and the controlling decisions of the Supreme Court of the United States of, the requirements of 28 U.S.C. §2254(d) have been satisfied. The contemporaneous record, not post hoc reconstruction, supplies the common framework for each Ground.

As to the principal trial state claims developed in this Reply, the scope of relief should follow the scope of the constitutional prejudice the Court finds. Counts 1 and 2 concern the Clarice J. incident; Counts 4, 5, and 6 concern the later Betsy V. incident. Relief may therefore be trial wide if the Court sustains

the Mauline F. related Strickland claim or determines that the combined prejudice of multiple independently established Strickland performance deficiencies affected the jury's adjudication across both incidents, or count specific if the constitutional injury is confined tot he Betsy V. related convictions.

PRAYER FOR RELIEF

Petitioner respectfully requests that this Court grant the Petition to the extent warranted by any Ground or preserved subclaim sustained and issue a conditional writ of habeas corpus or other appropriate relief tailored to the constitutional violation or violations established. A ruling sustaining Ground Two establishes direct entitlement to relief on that Strickland claim and, to the extent the sustained constitutionally deficient act or omission produced the preservation default, supplies the cause component of Ground Four's procedural default analysis. Ground Four separately requires the actual prejudice necessary to excuse the default and satisfaction of the applicable AEDPA and Brecht standards. Petitoner therefore requests that any conditional order reflect the scope of the constitutional violation or violations the Court finds. The same principle applies to any other preserved Ground One subclaim sustained by the Court, with the form and scope of relief tailored to the conviction, sentence, plea process, or trial proceeding affected by that constitutional violation.

The forms or relief identified below are cumulative and nonexclusive. They aren't intended to limit the Court's authority to fashion the relief warranted by any Ground or preserved subclaim the Court sustains. Consistent with 28 U.S.C. §2243, the scope of relief should follow the scope of the constitutional injury established: trial wide where the violation and resulting prejudice affected the jury's adjudication as a whole; count specific where the constitutional injury is confined to particular convictions; and otherwise tailored to the sentence, plea process, or proceeding affected. Petitioner therefore requests any conditional

writ, vacatur, new trial order, resentencing, plea releated remedy, consequential amendment of judgment, or other relief necessary to remedy the constitutional violation established, as law and justice require.

If relief is granted on a preserved plea communications ineffective assistance subclaim, Petitioner requests the remedy appropriate under Lafler v. Cooper, 566 U.S. 156 (2012) and Missouri v. Frye, 566 U.S. 134 (2012), including reoffer where legally required and the state court proceedings and remedial discretion those decisions preserve. If relief is granted on a sentencing related subclaim, Petitioner requests any consequential resentencing necessary to remedy that violation.

As to the principal trial stage Grounds developed in this Reply:

(1) If the Court sustains the Mauline F. related Strickland claim in Ground One, or determines that multiple independently established Strickland performance deficiencies collectively satisfy that required prejudice showing across both incidents, Petitioner requests that the conditional writ extend to all convictions returned in this trial (Counts 1, 2, 4, 5, and 6).

(2) If the Court finds that the constitutional error or prejudice established under Grounds Two and/or Four is confined to the Betsy V. incident, Petitioner requests that the conditional writ extend Counts 4 and 5 and to Count 6 to the extent the Court finds that the same constitutional error or resulting prejudice materially affected the jury's adjudication of that count. In either event, Petitioner requests an order requiring the State, within a reasonable period fixed by the Court, to vacate the affected conviction(s) and provide the constitutionally appropriate remedy, including a new trial where retrial is permitted and appropriate; failing timely compliance, Respondent shall release Petitioner from custody attributable to those convictions.

Petitioner further requests any consequential amendment of the judgment,

resentencing as appropriate, and any other relief necessary to give full effect to the writ, as law and justice require. If relief is denied in whole or in part, Petitioner respectfully requests a Certificate of Appealability under 28 U.S.C. §2253(c) as to each Ground, preserved subclaim, and dispositive issue on which reasonable jurists could debate the Court's resolution, including the relationship between the Ground Two ineffective assistance claim and Ground Four's cause showing.

Dated: September 25, 2026.

Respectfully submitted,

ROSS CAMPBELL,
Petitioner pro se
594 Route 216
Stormville, NY 12582

# CERTIFICATE OF SERVICE

I, ROSS CAMPBELL, hereby certify that on this 25th day of September, 2026, that I have caused a copy of the foregoing and a true, correct, and complete Original of the foregoing: **Reply to the State's Answer and Memorandum of Law Opposing Petitioner's Petition For Writ of Habeas Corpus**, upon:

[ORIGINAL]

Attn: Hon. John G. Koeltl, U.S.D.J.

c/o: CLERK OF COURT
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
U.S. COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007

[COPY]

Hon. Darcel D. Clark,

District Attorney, Bronx County
OFFICE OF THE DISTRICT ATTORNEY
198 EAST 161st STREET
BRONX, NY 10451

by placing the above in a post-paid envelope and depositing it in a United States Postal Service Mailbox located at Green Haven Correctional Facility, Stormville, New York 12582, for prompt processing and mailing by authorized prison personnel, and it shall be deemed FILED as of the above date, per the federal "mailbox rule." Houston v. Lack, 487 U.S. 266, 270 (1988).

Ross Campbell

ROSS CAMPBELL,
Petitioner, pro se